**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arthur GRAY, Defendant–Appellant.**

No. 88–5114.

United States Court of Appeals,
Fourth Circuit.

Argued April 14, 1989.

Decided Aug. 28, 1989.

David T. Williams (Robert Stanley Powell, Alexandria, Va., on brief), for defendant-appellant.

William Graham Otis, Asst. U.S. Atty., Henry E. Hudson, U.S. Atty., Alexandria, Va., Philip K. Eure, Sp. Asst. U.S. Atty., on brief, for plaintiff-appellee.

Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

ERVIN, Chief Judge:

Arthur Gray appeals from the district court's denial of his motion to suppress the narcotics seized from him following a search of his person made by Drug Enforcement Administration Agents at Washington National Airport. Finding that appellant consented to this search following a voluntary encounter with the agents, we affirm the district court's refusal to suppress the evidence.

# I.

*Factual and Procedural Background*

On March 1, 1988, the defendant-appellant, Arthur Gray, arrived at Washington National Airport on an Eastern Airlines shuttle from New York City. Shortly after he deplaned, Gray was approached by Special Agent Floyd Johnston of the Drug Enforcement Administration ("DEA"). Johnston identified himself to Gray, and walked alongside him through the terminal, asking him questions about the flight, his point of departure, and whether he was carrying drugs. The two men were joined by a second DEA agent, Bill Dwyer. At that point, Johnston requested and obtained permission to search Gray. The search revealed that Gray was carrying 21 grams of crack, and the agents arrested him.

Gray was subsequently indicted on a charge of possessing narcotics with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Gray moved to suppress the drugs seized during the search at National Airport, as well as the statements he made pursuant to his arrest, on the grounds that the evidence resulted from an illegal search and seizure. Following a full evidentiary hearing, the district court denied appellant's motion.

Gray then entered into a plea agreement whereby he agreed to plead guilty to the indictment, but preserved his right to appeal the denial of his motion to suppress, and to challenge the constitutionality of the Federal Sentencing Guidelines.[1] Appellant was convicted on his plea and sentenced to 5 years, 3 months in prison, a five-year period of probation, and was ordered to pay a special assessment of $50.00.

The evidence at the suppression hearing consisted almost entirely of the testimony of Special Agent Johnston. The agent stated that he initially approached Gray because the appellant had arrived on the shuttle from New York, a source city, and because Gray was guarding the front of his unzipped jacket, in his abdominal area, as if

he were trying to hide the front of his pants. Johnston approached Gray in the terminal area, identified himself, and asked if he could speak with appellant; Gray replied "sure." Johnston then accompanied Gray as appellant walked toward the escalator, went up the escalator, and went down a hallway into the main terminal area. During their walk, the agent asked Gray if he had come in from New York, and if Johnston could see his airline ticket. Gray explained that he had left his ticket on the airplane. When Johnston requested identification, Gray produced a laminated i.d. card bearing his name and picture. Johnston returned the card, explained the "purpose and function of the DEA" to Gray, and asked Gray if he was carrying drugs. At this point, the two men, who had stopped walking, were joined by DEA Special Agent Dwyer. Johnston introduced Gray to Dwyer, and again asked appellant if he were carrying drugs; Gray replied that he was not.

Johnston then requested permission to search Gray's person. According to the agent, Gray replied "Sure. Go ahead." Johnston then asked Gray if he objected to stepping out of the stream of pedestrian traffic, and Gray indicated that he did not. All three men stepped into a public alcove, where Johnston once again asked Gray: "Do you mind if I search—are you sure you don't mind that I search your person? You don't have to let me if you don't want to." Appellant told the detective to "go ahead," and lifted his arms out from his waist. The search revealed Gray's possession of 21 grams of crack, whereupon the agents advised Gray of his rights and arrested him.

# II.

*Fourth Amendment Seizure Question*

The decision of the trial court not to suppress the evidence in question was based solely upon the testimony of Agent Johnston. Given this testimony, the lower court found that appellant's contact with the DEA agents amounted to an "encoun-

---

1. Gray declined to argue the unconstitutionality of the guidelines either in his brief or at oral

argument, and for that reason we do not address the issue.

ter, rather than a Fourth Amendment seizure."

The finding that a fourth amendment seizure of an individual has or has not occurred involves a question of fact and cannot be reversed unless clearly erroneous. *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982). In reviewing fourth amendment seizure determinations, the appellate courts have recognized that the determination of precisely when an officer's "polite request for an interview" in fact becomes a fourth amendment seizure is "not always an easy one," *United States v. Viegas*, 639 F.2d 42, 44 (1st Cir.) *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981), may be "extremely close," *United States v. Mendenhall*, 446 U.S. 544, 560 at n. 1, 100 S.Ct. 1870, 1880 at n. 1, 64 L.Ed.2d 497 (Powell, J., concurring), and calls for a "refined judgment" by the trial court. *United States v. Elmore*, 595 F.2d 1036, 1041–42 (5th Cir.1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

In determining whether a person has been "seized" within the meaning of the fourth amendment the federal courts have focused on whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion).[2] As one court has explained this standard, "[so] long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982).

The federal courts have examined a variety of factors when determining wheth-

er a particular police-citizen encounter constitutes a seizure in the context of airport surveillance. They have, however, tended to focus on three particular areas: (1) the conduct of the police; (2) the characteristics of a particular defendant; and (3) the physical surroundings of the encounter. *See Black, supra*, at 134. When examining the conduct of a police officer the courts have looked to whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." *Viegas, supra*, at 45, (quoting *Terry v. Ohio*, 392 U.S. 1, 19 at n. 16, 88 S.Ct. 1868, 1879 at n. 16, 20 L.Ed.2d 889 (1967)). We emphasize, however, that "[a]n individual need not be held at gunpoint" *Black, supra*, at 134, for a fourth amendment seizure to occur. "[A]ny restraint of movement will do," *Elmore, supra*, at 1041, including "a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way." *Black, supra*, at 135.

The courts have examined a number of factors when determining whether an officer did, in fact, display such a "show of authority." The factors most frequently looked to by the courts include: (1) the number of police officers present, *United States v. Aguiar*, 825 F.2d 39, 40 (4th Cir. 1987); *United States v. Borys*, 766 F.2d 304, 311 (7th Cir.1985); (2) whether the police officers were in uniform and whether they displayed their weapons, *Black supra*, at 135; *United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986); (3) whether the officer touched the defendant or made any attempt to physically block his departure or restrain his movement, *Aguiar, supra*, at 40; *Borys, supra*, at 310; (4) whether the officer's questioning was "con-

---

2. Although articulated only in a plurality opinion of the Supreme Court, a number of circuits have adopted the "not free to leave" test as the operational test for determining whether a fourth amendment seizure short of arrest has occurred. *See United States v. West*, 651 F.2d 71, 72–73 (1st Cir.1981); *United States v. Jefferson*, 650 F.2d 854, 856 (6th Cir.1981); *United States v. Patino*, 649 F.2d 724, 726–27 (9th Cir. 1981); *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982); *United States v. Berry*, 670 F.2d

583, 595 (5th Cir. Unit B 1982) (en banc). While this circuit has declined to adopt specifically this test, *United States v. Gooding*, 695 F.2d 78, 81 (4th Cir.1982), we have never objected to the district courts' application of this rule, and have frequently reviewed lower court decisions based on the "not free to leave" standard. *See, e.g., United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986); *United States v. Aguiar*, 825 F.2d 39, 40 (4th Cir.1987).

versational" rather than "intimidating"—i.e. did the officer raise his voice or threaten the defendant, *Black, supra.* at 135; (5) whether the officer informed the defendant that he positively suspected him of illegal activity rather than treating the encounter as "routine" in nature, *Borys, supra,* at 311, *United States v. Berry,* 670 F.2d 583, 597 (5th Cir. Unit B 1982) (en banc); and (6) whether, if the officer requested from the defendant either his plane ticket or some form of official identification, the officer promptly returned it. *Aguiar, supra* at 40; *Lehmann, supra,* at 692; *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1984).

■ The conduct of the DEA agents in this particular case supports the district court's conclusion that their interview with Gray was in fact a consensual encounter, rather than a fourth amendment seizure. The two officers who questioned Gray were dressed in ordinary street clothes, and they at no time displayed their weapons or otherwise attempted to intimidate Gray either physically or verbally. Indeed, Agent Johnston informed Gray that he did not have to consent to a search of his person, something which the agent was under no legal obligation to do. *See, e.g., Mendenhall, supra,* 446 U.S. at 555, 100 S.Ct. at 1877. Additionally, the agents never made any attempt to restrain Gray's movement, but instead walked with him as he moved through the airport towards the exit. Although Johnston requested and received appellant's identification card, he promptly returned it after a brief examination.

While Johnston and Dwyer had identified themselves as DEA agents, it is not enough to establish a seizure "that the person asking the questions was a law enforcement official." *Id. See also, Royer, supra,* 460 U.S. at 497, 103 S.Ct. at 1323 (Holding that officers questioning individuals who are willing to listen in a public place does not amount to a seizure); *Lehmann, supra,* at 694 (A defendant's voluntary cooperation in answering an officer's questions does not "absent coercive circumstances ... implicate the fourth amendment."). Further-

more, the officers' tone apparently remained "conversational" throughout the encounter and Johnston, who had informed Gray of the DEA's purpose and function, treated the questioning as a matter of routine, rather than as a particularized investigation of Gray.

Courts have also taken into consideration any unique characteristics of a particular defendant in deciding whether an apparently consensual encounter might have, under the circumstances, overcome that individual's freedom to walk away. In *United States v. Patino,* 649 F.2d 724 (9th Cir. 1981), for example, the Ninth Circuit affirmed the district court's finding that the defendant had been seized when the police requested an interview. The court noted that the defendant had problems understanding English, and was an alien who most likely felt compelled to cooperate with the police. Here, however, we can find no evidence that appellant was "so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment." *Black, supra* at 135.

Finally, courts have looked to the physical setting of particular police-citizen encounters to determine whether the encounter constituted a seizure. In the instant case the encounter between Gray and law enforcement officials took place entirely in public areas of the airport. Gray's consent to talk with the officers, as well as his consent to the body search, were given in the public concourse with other travelers present. While the search itself took place in a less crowded alcove, to avoid the flow of pedestrian traffic, the alcove was nonetheless public. In short, Gray's acquiescence to the officers' request to move to the alcove "did not result in his isolation or restraint, and was therefore of no legal significance." *Id. See also United States v. Allen,* 644 F.2d 749, 751 n. 3 (9th Cir. 1980). *Compare United States v. Jefferson,* 650 F.2d 854, 858 (6th Cir.1981) (Holding that a seizure had occurred where the defendant was taken immediately from a public concourse into a private office for questioning.)

The public setting of Gray's encounter with the police, in conjunction with the conduct of the DEA agents and the absence of any factor making Gray particularly susceptible to a police officer's request for an interview, leads us to the same conclusion reached by the trial court—that the officers' contact with Gray constituted a consensual encounter, rather than a fourth amendment seizure. The decision of the district court, therefore, is hereby

AFFIRMED.