**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                           No. 99-4279

LAWRENCE MARCELL WILLIAMS,
Defendant-Appellee.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                           No. 99-4280

VASILIOS DOURDOUMIS,
Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-99-6, CR-99-7)

Argued: February 29, 2000

Decided: June 5, 2000

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by unpublished opinion. Judge Traxler wrote
the majority opinion, in which Judge Niemeyer concurred. Judge
Michael wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Alessandra DeBlasio, Special Assistant United States Attorney, Alexandria, Virginia, for Appellant. William Anthony Lascara, LASCARA & ASSOCIATES, P.C., Norfolk, Virginia, for Appellees. **ON BRIEF:** Helen F. Fahey, United States Attorney, Alexandria, Virginia; James Ashford Metcalfe, Assistant United States Attorney, Norfolk, Virginia, for Appellant. Steven C. Frucci, BRYDGES, MAHAN, OBRIEN & FRUCCI, P.C., Virginia Beach, Virginia, for Appellee Dourdoumis.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

TRAXLER, Circuit Judge:

Lawrence Marcell Williams and Vasilios Dourdoumis (the "Defendants") were indicted on various charges stemming from their illegal possession of handguns. The Defendants moved to suppress the evidence obtained during what they contended was an illegal search and seizure. The district court granted the suppression motions, and the government now appeals. We reverse and remand.

I.

Shortly before eleven o'clock one evening, Virginia Beach police officer Matthew Bracey was dispatched after a "9-1-1 hang-up" call to the Burger King restaurant where the call originated. J.A. 21. The restaurant was located in a part of town where robberies were reported from time to time.

When he arrived at the restaurant, Officer Bracey saw the Defendants standing outside using a pay phone attached to the front of the building. Bracey also saw two Burger King employees outside the

restaurant, on the other side of the restaurant entrance from the Defendants. Bracey, who was in uniform, parked his marked police car near the employees, away from the Defendants, and approached the employees. One of the employees told Bracey that the Defendants had entered the restaurant without ordering and had gone into the bathroom, where they had stayed for an extended period. According to the employee, the manager became nervous and called 911. Because the Defendants left the bathroom and walked out of the restaurant just as the manager placed the call, she hung up before speaking to the dispatcher. The employee told Bracey that the Defendants "weren't doing anything wrong" and that the manager "was overreacting" when she called 911. J.A. 33.

As Bracey approached the employees, the Defendants looked at him and then began walking away from the restaurant. After talking with the employees, Bracey did not wait to talk to the manager, but instead got back in his car and caught up with the Defendants, who were still walking, not far from the restaurant. Bracey pulled his car off the road several yards behind the Defendants, turning on the flashing lights located in the back window and in the front grill of the car so the car would be visible to traffic. Bracey did not activate the overhead lights.

The Defendants kept walking until Bracey got out of his car, walked up to them, and asked if he could "talk to them for a minute." J.A. 24. Bracey explained that he had been dispatched to the Burger King because "somebody felt like the Burger King was going to be robbed." J.A. 24. Bracey told the Defendants that there had been a "series of robberies" in the area, J.A. 46, and that he "wanted to make sure they weren't up to no good." J.A. 24. Bracey readily admitted at the suppression hearing that he had no knowledge of any robberies that night and that his statement was a "ruse" intended to encourage the Defendants' cooperation.

The Defendants stopped walking when Bracey asked if he could talk to them. Dourdoumis told Bracey that they worked at an oceanfront restaurant and were just walking home. Bracey asked Dourdoumis if he could pat him down for weapons, specifically telling Dourdoumis that he was not looking for drugs. Although Dourdoumis made no verbal reply, he put down the leather jacket he was carrying

3

over his arm, held his arms straight out, and spread his legs. While Bracey patted him down, Dourdoumis told the officer that he and Williams "were just waiting for a ride." J.A. 25. Bracey found nothing in his frisk of Dourdoumis.

Bracey then picked up the leather jacket that Dourdoumis had placed on the ground and noticed that it felt unusually heavy. Bracey squeezed the inside breast pocket and felt a gun. Bracey dropped the jacket, withdrew his own gun, and ordered Dourdoumis and Williams to lie down on the ground. They immediately complied. Another police unit had arrived on the scene at this point, and an officer from that car handcuffed the Defendants and discovered another handgun in the waistband of Williams's pants. The serial numbers of both guns had been obliterated. After the Defendants were arrested, Williams gave statements indicating that he and Dourdoumis bought the handguns together and that they knew when they bought the guns that the guns were stolen.

Williams and Dourdoumis were charged with knowingly possessing stolen firearms, see 18 U.S.C.A. § 922(j) (West Supp. 1999), and with knowingly possessing firearms with obliterated serial numbers, see 18 U.S.C.A. § 922(k) (West Supp. 1999). Dourdoumis was also charged with being a felon in possession of a firearm. See 18 U.S.C.A. § 922(g)(1) (West Supp. 1999).

The Defendants moved to suppress, arguing that the initial stop was improper because Officer Bracey lacked a reasonable suspicion to believe that the Defendants were involved in a crime. The district court granted the Defendants' motions.

The court rejected the government's argument that the encounter between Bracey and the Defendants was a consensual police-citizen encounter and thus outside the reach of the Fourth Amendment, instead concluding that the encounter was a stop governed by Terry v. Ohio, 392 U.S. 1 (1968). The court then determined that Officer Bracey lacked a particularized suspicion that the Defendants were involved in criminal activity. Finally, the district court ruled that while Dourdoumis's "actions were reasonably construed as suggesting consent," a reasonable person would have believed that consent was compelled. J.A. 72. The district court thus concluded that the pat-

4

down search of Dourdoumis was improper. The court also concluded that any consent from Dourdoumis did not extend to a search of the leather jacket.

II.

Appealing the suppression of the evidence pursuant to 18 U.S.C.A. § 3731 (West Supp. 1999), the government contends the district court erred in ruling that this case involved a Terry stop rather than a consensual encounter between the Defendants and Officer Bracey. We agree.

"Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." Id. (citation and internal quotation marks omitted); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) ("[A] person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

Whether an encounter between citizens and the police is a Fourth Amendment seizure or a consensual encounter raising no constitutional questions is an issue of fact that cannot be reversed unless the district court's findings are clearly erroneous. See United States v. Porter, 738 F.2d 622, 625 (4th Cir. 1984) (en banc); accord United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989). However, "[b]ecause the test [to determine whether an encounter was consensual or a Fourth Amendment seizure] is an objective one, its proper application is a question of law." United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998).

Determining whether an encounter was consensual requires consideration of many different factors, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request

5

might be compelled." Mendenhall, 446 U.S. at 554; cf. Gray, 883 F.2d at 322 ("The federal courts have examined a variety of factors when determining whether a particular police-citizen encounter constitutes a seizure in the context of airport surveillance. They have, however, tended to focus on three particular areas: (1) the conduct of the police; (2) the characteristics of a particular defendant; and (3) the physical surroundings of the encounter."). After considering the facts in light of the appropriate factors, we conclude that this case involves a quintessential consensual police-citizen encounter, and not a seizure within the meaning of the Fourth Amendment.

There is nothing in the conduct of Officer Bracey that would cause a reasonable person to believe that he was not free to ignore Bracey's questions or to terminate the encounter. The encounter initially involved only Officer Bracey and the Defendants. When he approached the Defendants, Bracey asked in a very conversational way whether he could ask them a few questions.[1] Bracey did not display his weapon until after he found the gun in Dourdoumis's jacket, and he did not touch the Defendants or in any way prevent them from leaving until the gun was found. Although Bracey told the Defendants that he "wanted to make sure they weren't up to no good," this statement did not indicate that the Defendants were the subjects of a particularized investigation.[2] While Bracey was in uniform and had

_____

[1] The dissent contends this characterization of Officer Bracey's tone of voice is not supported by the record, focusing on Bracey's statement that he spoke to the Defendants "like a principal was speaking to a child or a police officer was speaking to a suspect." J.A. 44. However, Bracey's next statement was that he "was talking to them like people, just in a normal tone of conversation." J.A. 44. Considering Officer Bracey's testimony as a whole and in context, we believe this conclusion is amply supported by the record. We also note that the district court did not make any factual findings about Bracey's tone of voice, nor did the court include Bracey's tone of voice as a reason for rejecting the consensual encounter theory.

[2] When determining whether a "show of authority" converts an encounter into a seizure, one consideration is "whether the officer informed the defendant that he positively suspected him of illegal activity rather than treating the encounter as `routine' in nature." Gray, 883 F.2d at 323. We see no meaningful difference between Officer Bracey's up-to-no-good statement and the "you're-not-carrying-any-drugs-are-you?" kind of question asked in many of the airport stop cases that have also been found to involve consensual encounters. See, e.g., id.

6

activated the flashing grill lights on his police car, he did not activate the overhead lights, and he parked the car several yards behind the Defendants before approaching them on foot. Thus, we conclude that Officer Bracey's limited "show of authority" would not cause a reasonable person to believe he was not free to leave. In addition, the encounter took place in a parking area beside a public street and, as noted above, Bracey did nothing to prevent the Defendants from continuing their walk. These facts further indicate that the encounter was consensual. See United States v. Morgan, 914 F.2d 272, 274 (D.C. Cir. 1990) (per curiam) ("Wherever its precise boundaries may lie, a seizure requires more than the initial encounter detailed in this record: officers who, displaying no weapons and speaking in a normal tone of voice, approach individuals in a public place and ask permission to talk with them.").

The dissent focuses much of its attention on Officer Bracey's use of the flashing grill lights when he pulled his cruiser in behind the defendants. However, most of the cases cited by the dissent to show that the use of flashing lights amounts to a show of authority and a stop do not involve pedestrians but instead involve situations where the police used flashing lights in the course of stopping or attempting to stop a moving vehicle. See Brower v. County of Inyo, 489 U.S. 593, 594 (1989); McChesney v. State, 988 P.2d 1071, 1073 (Wyo. 1999); Brooks v. State, 745 So. 2d 1113, 1113 (Fla. Dist. Ct. App. 1999); State v. Yeargan, 958 S.W.2d 626, 627-28 (Tenn. 1997); Barrett v. Commonwealth, 447 S.E.2d 243, 244 (Va. Ct. App. 1994), rev'd, 462 S.E.2d 109 (Va. 1995); Beckner v. Commonwealth , 425 S.E.2d 530, 531 (Va. Ct. App. 1993); State v. Langseth, 492 N.W.2d 298, 299 (N.D. 1992); State v. Indvik, 382 N.W.2d 623, 624 (N.D. 1986); State v. Walp, 672 P.2d 374, 374-75 (Or. Ct. App. 1983).**3** Given that it typically is a crime not to stop a vehicle when so signaled by law

_____

**3** In the cases that did not involve attempts to stop a moving vehicle, the defendants were sitting in or standing near parked cars (in some cases, with the engine running) when approached by the police. See Clarke v. Commonwealth, 2000 WL 486257, at *1 (Va. Ct. App. Apr. 25, 2000); State v. Donahue, 742 A.2d 775, 778 (Conn. 1999); Lawson v. State, 707 A.2d 947, 949 (Md. Ct. Spec. App. 1998); State v. Burgess, 657 A.2d 201, 202 (Vt. 1995); State v. Stroud , 634 P.2d 316, 317 (Wash. Ct. App. 1981).

7

enforcement, see, e.g., Va. St. Ann. § 46.2-817 ("Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal, shall be guilty of a Class 4 misdemeanor."), we do not find these cases particularly instructive. Moreover, we again point out that the Defendants did not stop when Officer Bracey parked his car behind them while they were walking down the street. They did not stop until Officer Bracey caught up with them and asked if he could ask them some questions. While the determination of whether an encounter was consensual is an objective one, that the Defendants did not feel compelled to stop when Bracey turned on his flashing lights raises some question about the dissent's conclusion that a reasonable person would have felt compelled to stop.

Finally, we simply disagree with the dissent about the legal significance of the district court's statement from the bench that "[t]his is not a situation where the police [officer] . .. simply question[ed] these defendants because he wanted to know about something somebody else was doing or something that might be happening in the area. This officer's focus was on these defendants." J.A. 59. As we noted above, "whether the officer informed the defendant that he positively suspected him of illegal activity rather than treating the encounter as `routine' in nature" is relevant to the show-of-authority inquiry when determining whether an encounter was consensual. Gray, 883 F.2d at 323. The district court's statement, however, seems to suggest that an encounter can never be consensual if the officer believes that the person he has stopped in fact committed a crime and the officer questions that person about his own activities. Clearly, that is an incorrect analysis of the law. See, e.g., United States v. Wilson, 895 F.2d 168, 170-71 (4th Cir. 1990) (per curiam) (finding encounter between a DEA agent and the defendant to be consensual even though the agent became suspicious of the defendant after watching the defendant in an airport and even though the agent approached the defendant, identified himself as a DEA agent, asked the defendant if he was carrying any drugs, and asked the defendant if he could search him). To the extent that the district court's statement amounts to a factual finding, it appears to rest on an incorrect legal principle, and we thus owe it no deference. See Consolidation Coal Co. v. Local 1643, United Mine Workers of America, 48 F.3d 125, 128 (4th Cir. 1995) ("[T]he clearly

8

erroneous rule does not protect findings `made on the basis of the application of incorrect legal standards.'" (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir. 1984)).

After considering the record as a whole, we conclude that a reasonable person would have felt free to decline Officer Bracey's request to answer some questions or to otherwise terminate the encounter. See Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (The Mendenhall free-to-leave standard "is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."); see also United States v. Analla, 975 F.2d 119, 121-25 (4th Cir. 1992) (finding encounter between defendant and two, then later three, police officers to be consensual in case where officers parked a police car on either side of the defendant's car at 45-degree angles to the car; officers asked to see the defendant's license and registration and informed the defendant that he matched the description of a murder suspect; and officers never told the defendant that he was free to leave, that he could refuse to answer their questions, or that he could refuse the search of his car). Accordingly, we conclude that the district court clearly erred when it determined that the encounter between the Defendants and Officer Bracey was not consensual.[4] See United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996) (en banc) (A district court's factual determination is clearly erroneous if "it can be said that the view of the evidence taken by the district court is implausible in light of the entire record.").

_____

[4] When ruling that the encounter was not consensual, the district court found it significant that Officer Bracey's real purpose in approaching the Defendants was to search them rather than to ask them questions. While we question whether the record supports the district court's characterization of Officer Bracey's purpose, we note that even if Officer Bracey's ultimate, or only, purpose was to search the Defendants, that does not prevent the encounter from being a consensual police-citizen encounter. See United States v. Wilson, 895 F.2d 168, 171 (4th Cir. 1990) (per curiam) ("[A] permissible encounter does not mature into a seizure when an otherwise consensual search occurs."). Moreover, the inquiry into whether an encounter was a consensual one or a seizure is an objective one. See id. The police officer's subjective intentions, therefore, do not automatically convert a consensual encounter into a Fourth Amendment seizure.

9

III.

Because we conclude that the encounter was a consensual one, we must now turn to the issue of the pat-down search of Dourdoumis and the discovery of the gun in his leather jacket. When Officer Bracey asked if he could pat down Dourdoumis to see if he was carrying any weapons, Dourdoumis responded by putting down the jacket he was carrying and spreading out his arms and legs. The district court ruled that while these "actions were reasonably construed as suggesting consent, . . . any reasonable person would, under the circumstances of the encounter, believe that consent was required and that he was not free to terminate the encounter, refuse the search and leave." J.A. 72. The district court therefore concluded that the search was illegal and that Dourdoumis did not consent to the search of his jacket.

As we understand the district court's order, the court concluded that the otherwise consensual pat-down of Dourdoumis was tainted by what the court viewed as an illegal detention. See Florida v. Royer, 460 U.S. 491, 507-08 (1983) (plurality opinion) ("Because we affirm the . . . conclusion that Royer was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search."). However, as discussed in the previous section, the encounter between the Defendants and Officer Bracey was a consensual police-citizen encounter; thus, there was no illegality to taint any consent given by Dourdoumis. The district court's consent determination is a factual one generally reviewed under the clearly erroneous standard. See Lattimore, 87 F.3d at 650. However, that standard is inapplicable where, as here, the factual determination is premised upon an incorrect conclusion of law. See Consolidation Coal Co., 48 F.3d at 128; see also United States v. Hare, 150 F.3d 419, 426 (5th Cir. 1998) ("On appeal, this court accepts the trial court's factual findings at a suppression hearing unless they are clearly erroneous or influenced by an incorrect view of the law."). We therefore proceed to determine de novo whether Dourdoumis voluntarily consented to the search.

When determining whether a consent to search was voluntarily given,

> the totality of the circumstances surrounding the consent must be examined. In viewing the totality of the circum-

10

> stances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter).

Lattimore, 87 F.3d at 650 (citation omitted).

In our view, Dourdoumis's actions clearly amounted to a consent to search. See United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994) (concluding that defendant consented to request to search his car by unlocking the car door); Wilson, 895 F.2d at 172 (concluding that defendant consented to officer's request to pat him down by "shrugging his shoulders and raising his arms"). And our review of the record convinces us that the consent was voluntarily given. The request to search was made by a single officer during a consensual encounter in a public area, and nothing in the way in which the request was phrased suggested that Dourdoumis was required to comply. Although the record contains scant evidence about Dourdoumis himself, see Wilson, 895 F.2d at 171 (observing that whether a defendant consented to a search is a subjective inquiry), we note that Dourdoumis and Williams did not stop walking when Officer Bracey parked his police car on the side of the road several yards behind them, but only when Bracey got out of the car and asked if he could talk to them. In our view, this indicates that Dourdoumis was not intimidated by the mere presence of a police officer and that Dourdoumis fully recognized that he was free to ignore Officer Bracey if he so chose. After considering the totality of the circumstances surrounding the encounter and Dourdoumis's consent, we conclude that the consent was voluntarily given and that the pat-down was therefore proper.

The next question we must consider is whether Officer Bracey exceeded the scope of Dourdoumis's consent when he searched the leather jacket. We conclude that the search of the jacket was proper.[5]

_____

[5] It is not clear from the record whether Officer Bracey intended to patdown the jacket when he picked it up or if he was merely handing it back to Dourdoumis as a courtesy. Nonetheless, we assume for the purposes of this opinion that Bracey searched the jacket when he picked it up from the ground.

11

"When an official search is properly authorized--whether by consent or by the issuance of a valid warrant--the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 656 (1980) (plurality opinion); see also United States v. McFarley, 991 F.2d 1188, 1191 (4th Cir. 1993) ("While consent generally has its limits, a consensual search or seizure within those limits does not implicate constitutional rights.")."The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of `objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

In this case, Dourdoumis was carrying the leather jacket over his arm when Officer Bracey asked if he could pat down Dourdoumis for weapons. Given that weapons can easily be hidden in a coat pocket, a reasonable person would realize that consenting to a weapons pat-down would authorize the officer to pat down a coat carried by that person. See Jimeno, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object . . . . [The officer] had informed [Jimeno] that he believed [Jimeno] was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search [Jimeno's] car included consent to search containers within that car which might bear drugs."). We do not believe this conclusion changes simply because Dourdoumis put down the jacket before Bracey began the search, particularly since Dourdoumis did not object when Bracey picked up the jacket. See United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986) ("Failure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent."). We therefore conclude that the district court erred in determining that Dourdoumis did not consent to the search of his leather jacket.

IV.

Our conclusions that the encounter was consensual and that Officer Bracey's search of the leather jacket was proper disposes of Dourdoumis's arguments that the gun should be suppressed. See McFarley, 991 F.2d at 1191 ("When a private citizen voluntarily consents to

12

interrogation or a search by police officers, however, he cannot later claim, when criminal conduct is uncovered, that his Fourth Amendment rights were violated."). As to Williams, however, the analysis is somewhat different, given that he did not speak during the encounter and did not consent to a search of his person.

When Officer Bracey found the gun in Dourdoumis's jacket, he clearly had probable cause to arrest Dourdoumis, but he did not then have probable cause to arrest Williams. Nonetheless, because Williams was with Dourdoumis at the Burger King and when the gun was found, the presence of the weapon on Dourdoumis gave Officer Bracey the right to perform a Terry pat-down to make sure Williams was not armed. See United States v. Poms, 484 F.2d 919, 922 (4th Cir. 1973) (per curiam) (concluding that Terry pat-down of a companion of the person arrested was proper: "[A]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory pat-down reasonably necessary to give assurance that they are unarmed." (internal quotation marks omitted)). **6** That the pat-down was performed while Williams was on the ground and in handcuffs is insufficient, under the facts of this case, to convert the Terry stop-and-frisk into an arrest. See United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (rejecting the argument that the use of handcuffs turned a Terry stop into an arrest: "Brief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances."); United States v. Tilmon, 19 F.3d 1221, 1227-28 (7th

_____

**6** There may be circumstances where a blind application of the apparently per se rule announced in Poms might be inappropriate. See, e.g., Ybarra v. Illinois, 444 U.S. 85, 94 (1979) (A warrant authorizing the search of a bar and its bartender does not authorize a pat-down of the bar's patrons absent an individualized suspicion that the patron to be searched was armed and dangerous; "[t]he`narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."). Given the circumstances of the encounter here, however, we have no doubt that the pat-down of Williams was appropriate to protect Officer Bracey's safety.

13

Cir. 1994) (where officers believed suspect might be armed, ordering suspect to lie on the ground and handcuffing him did not convert <u>Terry</u> stop into an arrest). Once the gun was found on Williams, then there was probable cause to arrest him as well.

V.

To summarize, we conclude that the encounter between Officer Bracey and the Defendants was a consensual encounter not implicating the Fourth Amendment, that Dourdoumis voluntarily consented to a search of his person, and that Officer Bracey did not exceed the scope of that consent when he searched the leather jacket. The presence of the gun in that jacket gave Bracey probable cause to arrest Dourdoumis, which gave Bracey the right to frisk Williams for weapons.[7] The district court, therefore, clearly erred by granting the Defendants' suppression motions. Accordingly, we reverse the district court's suppression order and remand to the district court for further proceedings.

<u>REVERSED AND REMANDED</u>

MICHAEL, Circuit Judge, dissenting:

I agree that the test we apply here is the familiar one from <u>Florida v. Bostick</u>: "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." 501 U.S. 429, 434 (citation and internal quotation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968). In applying this test, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." <u>Bostick</u>, 501 U.S. at 439. My disagreement with the majority concerns its failure

_____

**7** Given these conclusions, we need not consider whether the encounter between the Defendants and Officer Bracey could be sustained under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

14

to give appropriate consideration to the findings of the district court or to recognize how the circumstances surrounding the encounter would actually appear to a reasonable person. I therefore respectfully dissent from Parts I and II of the majority's opinion. I would not reach the issues discussed in Parts III and IV.

I.

Late in the evening on October 7, 1998, Officer Matthew Bracey arrived at the Virginia Beach Burger King in a marked police car, dressed in his uniform. As he approached two restaurant employees who were working outside, Bracey made eye contact with both Lawrence Williams and Vasilios Dourdoumis, who were using a pay phone. Moments later, Bracey drove down the street to where Williams and Dourdoumis were walking, stopping a few yards behind them in a dirt parking lot. Although he did not activate his overhead lights, Bracey turned on the red and blue flashing lights in the front grill of his police car and the flashing red lights in the rear window. The two men continued to walk along the road until Officer Bracey got out of his car and asked if he "could talk to them for a minute." Williams and Dourdoumis then turned around to see a uniformed officer leaving a marked police car with red and blue lights flashing in its front grill. Apparently before either Williams or Dourdoumis had said a word, Officer Bracey said that he had been dispatched to the Burger King because someone felt that it was "going to be robbed," that there had been a series of robberies in the area, and that he "just wanted to make sure that they weren't up to no good." Dourdoumis explained that he and his companion were simply walking home from work; Officer Bracey responded by asking whether they were carrying weapons and whether he could pat them down.

The district court summarized these events succinctly: "Officer Bracey testified that he made eye contact with the defendants at the Burger King, that he then approached them in his vehicle with lights flashing and that he communicated to them the fact that there had been several robberies in the area and that he would like to search them. A reasonable person would, under the circumstances of the encounter, not believe that he was free to terminate the interview and leave."

15

The majority does not directly challenge any of the district court's specific findings of fact, which may be disturbed only if they are "clearly erroneous." See United States v. Porter, 738 F.2d 622, 625 (4th Cir. 1984) (en banc). Instead, the majority simply concludes that the district court's ultimate finding, that the encounter between Officer Bracey and the defendants was not consensual,"is implausible in light of the entire record." Ante at 9. The record, however, provides ample support for the district court's conclusion.

Here, Officer Bracey displayed an unmistakable show of authority that would give a reasonable person the impression that he was not free to leave. A uniformed police officer in a marked police car with red and blue lights flashing constitutes a substantial show of authority in and of itself. See Brower v. County of Inyo , 489 U.S. 593, 597 (1989) (noting that "police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit"); Clarke v. Commonwealth, ___ S.E.2d ___, No. 0425-99-1, 2000 WL 486257, at *4 (Va. Ct. App. Apr. 25, 2000) ("We have held that when a police officer signals a motorist with his flashing lights, a reasonable motorist would conclude that he must comply with the officer's authority and stop, and that such a stop constitutes a Fourth Amendment seizure."); Barrett v. Commonwealth , 447 S.E.2d 243, 245 (Va. Ct. App. 1994) ("Clearly, Barrett was seized when Trooper Lyons pulled in behind him and activated his flashing lights."), aff'd in relevant part, rev'd on other grounds, 462 S.E.2d 109 (Va. 1995); Beckner v. Commonwealth, 425 S.E.2d 530, 535 (Va. Ct. App. 1993) (Commonwealth conceding that officer seized defendant when he activated emergency lights on marked police vehicle).**1** It is of no con-

_____

**1** Flashing red and blue lights present an obvious, unmistakable show of police authority with an implicit command to stop. See, e.g., Brooks v. State, 745 So.2d 1113, 1113-14 (Fla. Dist. Ct. App. 1999) (uniformed officer's use of flashing blue lights, even as a safety precaution, created circumstance where reasonable person would not feel free to leave); State v. Donahue, 742 A.2d 775, 780 (Conn. 1999) (state conceded that no reasonable person would feel free to leave after police officer activated flashing lights on vehicle); McChesney v. State, 988 P.2d 1071, 1075 (Wyo. 1999) (motorist not free to leave after police officer activated red and blue flashing lights on police car); Lawson v. State, 707 A.2d 947, 951 (Md. Ct. Spec. App. 1998) (holding that officer's use of

16

sequence, of course, that Officer Bracey subjectively intended to make his police car visible to oncoming traffic; under the objective test of Bostick our sole consideration is the impression that the flashing red and blue lights would make on a reasonable person. See, e.g., State v. Burgess, 657 A.2d 202, 203 (Vt. 1995) (holding that while "officer may have subjectively intended to activate his blue lights solely for the safety of other vehicles on the road," a reasonable person would not have felt free to leave). A reasonable person is certain to understand that when he is approached directly by a police cruiser with flashing red and blue lights, the officer is making a display of authority, not giving a safety warning. Thus, in this case a reasonable person would not have felt free to disregard Officer Bracey's unequivocal show of authority and continue to walk away.[2]

_____

flashing emergency lights "was a show of authority that constituted a seizure within the contemplation of the Fourth Amendment because it communicated to a reasonable person that there was an intent to intrude upon [defendant's] freedom of movement"); State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997) ("When an officer turns on his blue lights, he or she has clearly initiated a stop."); State v. Burgess, 657 A.2d 202, 203 (Vt. 1995) (holding that while "officer may have subjectively intended to activate his blue lights solely for the safety of other vehicles on the road," reasonable person would not have felt free to leave); State v. Langseth, 492 N.W.2d 298, 301 (N.D. 1992) (police car that followed vehicle with flashing lights converted encounter into a stop, even if flashing lights were amber, not red); State v. Indvik , 382 N.W.2d 623, 627 (N.D. 1986) (stressing use of flashing red lights on police car as sign of seizure); State v. Walp, 672 P.2d 374 (Or. Ct. App. 1983) (holding that a reasonable person would not feel free to drive away once officer turned on emergency lights); State v. Stroud, 634 P.2d 316 (Wash. App. 1981) (holding that defendant "was `seized' for Fourth Amendment purposes, at the moment the officers pulled up behind the parked vehicle and switched on the flashing light").

[2] The majority speculates that Williams and Dourdoumis disregarded this clear display of authority by continuing to walk down the street. Ante at 8. However, nothing in the record suggests that the two men saw Bracey's cruiser stop behind them, with its lights flashing, until he called out and they turned around to face him. Thus, the majority's inference that "the Defendants did not feel compelled to stop when Bracey turned on his flashing lights," ante at 8, is not supported by the evidence.

17

Moreover, the display of authority was not the only significant factor that would have led a reasonable person to believe that he was not free to leave. Officer Bracey's initial statements to Williams and Dourdoumis clearly indicated that "he positively suspected them of illegal activity rather than treating the encounter as `routine' in nature." United States v. Gray, 883 F.2d 320, 323 (4th Cir. 1989). The record does not support the majority's assertion that Officer Bracey spoke to Williams and Dourdoumis "in a very conversational way." Ante at 6. To the contrary, Bracey testified that he spoke to the two men authoritatively, "like a principal was speaking to a child or a police officer was speaking to a suspect." (emphasis added). When Bracey asked if he could talk to Williams and Dourdoumis for a minute, the defendants simply stopped and turned to face him. Bracey then told the defendants that robberies had been committed in the area, that he had been dispatched to the Burger King (where he had just seen them), that "somebody felt like the Burger King was going to be robbed," and that he "just wanted to make sure that they weren't up to no good." These circumstances do not suggest a "routine" encounter. Rather, Officer Bracey's statements suggested to the defendants that they had been placed at the scene of a specific crime in which Bracey and at least one other person suspected their involvement. Bracey further added to the impression that Williams and Dourdoumis were suspects when he disregarded Dourdoumis's explanation that they were just walking home and asked whether he could search the men for weapons. As the district court found:"This is not a situation where the police [officer was] simply questioning these defendants because he wanted to know about something somebody else was doing or something that might be happening in the area. This officer's focus was on these defendants."**3** Under these circumstances,

_____

**3** The majority tries to brush aside this factual finding by saying that it rests on a faulty legal premise. According to the majority, the district court's statement "seems to suggest that an encounter can never be consensual if the officer believes that the person he has stopped in fact committed a crime and the officer questions that person about his own activities." Ante at 8. Even assuming that the district court misunderstood the law, the majority's reasoning places the cart before the horse. Based on everything Officer Bracey said and did, the district court found that this was an encounter in which the officer had focused his attention on these particular suspects. That factual finding did not rest on any legal premise at all. The majority's quarrel is with the district court's legal

18

no reasonable person would have felt free to disregard the policeman and walk away. Rather, a person would believe that he was required to stay and dispel the officer's suspicion that he was "up to no good." See United States v. Gonzales, 79 F.3d 413, 420 (5th Cir. 1996) (noting that a "statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence that the fourth amendment has been implicated"); United States v. Berry, 670 F.2d 583, 597 (11th Cir. 1982) (en banc) ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.") (footnote omitted).

Finally, the majority misreads the import of Officer Bracey's use of a "ruse" in falsely informing the defendants that a robbery was suspected at the Burger King. Ante at 9, n.4. As the district court found, Bracey used the ruse because it "was effective in getting individuals to consent to searches." Specifically, Bracey testified that when he began encounters conversationally by saying "Hey, how are you doing?", people would "just turn and walk off." In other words, Bracey fabricated a story about a possible robbery because he knew that by doing so, he made the defendants feel less free to leave. Cf. Ohio v. Robinette, 519 U.S. 33, 48 (1996) (Stevens, J., dissenting) (officer's success in obtaining consent to search 786 times in a single year by asking particular question at end of traffic stop demonstrated that reasonable persons did not feel free to refuse). As the majority points out, the officer's subjective intentions do not automatically convert a consensual encounter into a Fourth Amendment seizure.

_____

conclusion that the stop was not consensual. But an appellate court cannot disregard a district court's findings of fact just because it disagrees with that court's subsequent conclusions of law. The cases cited by the majority do not suggest otherwise. See Consolidation Coal Co. v. Local 1643, United Mine Workers of America, 48 F.3d 125, 128-30 (4th Cir. 1995) (refusing to defer to district court's finding that arbitrator was biased when district court applied wrong burden of proof for bias); Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526, 1534 (4th Cir. 1984) (finding plain error in district court's conclusion that registered trademark was descriptive, not suggestive, when district court gave no weight to presumptive validity of mark and assumed incorrectly that plaintiff bore burden of proving that mark was suggestive).

19

Ante at 9 n.4. However, Officer Bracey's subjective intent is relevant to the determination of whether there was a consensual encounter "to the extent that that intent has been conveyed to the person confronted." Michigan v. Chesternut, 486 U.S. 567, 576 n.7 (1988). See also United States v. Mendenhall, 446 U.S. 544, 554 n. 6 (opinion of Stewart, J.). As the district court clearly recognized, Bracey's implication that he suspected the defendants of robbery and his statement that he wanted to make sure that they "weren't up to no good" were calculated to give the two suspects the impression that they were not free to leave. Bracey's "ruse," combined with his request to search for weapons, plainly conveyed his intent to detain Williams and Dourdoumis.

After considering all of the circumstances surrounding the encounter, I am convinced that a reasonable person would not have felt free to leave. A reasonable person would not simply disregard a police officer who directly approached him with flashing red and blue lights. A reasonable person would not ignore the officer's accusations of specific criminal conduct. And once the officer approached, accused, and requested consent to search, a reasonable person would not feel free to disregard the police and go about his business. Here, Bracey's unmistakable display of authority, his indication through tone of voice and express statements that Williams and Dourdoumis were robbery suspects, and his clearly conveyed intent to detain the two defendants combined to create a seizure under the Fourth Amendment.

II.

I would affirm the district court's finding that the encounter between Officer Bracey and the two defendants was not consensual. Because I also agree with the district court that Officer Bracey lacked reasonable suspicion to detain the defendants, I would affirm the district court's suppression of the evidence obtained through the unconstitutional stop. I would not reach the issue of Dourdoumis's consent to a search or the justification for the subsequent search of Williams.

20