GREGORY, Circuit Judge,
dissenting:
I cannot accept that Fourth Amendment protections are suspended or reduced in so-called “high-crime” neighborhoods. Because the majority’s opinion significantly lowers those constitutional protections for law-abiding citizens who, by choice or for reasons beyond them control, live in high-crime areas, I am compelled to dissent.
I.
In its recitation of the facts, the majority indicates that Black was thirty feet from the breezeway when he began his walk across the street, yet fails to note that Black was not amongst the group that fled moments before. (Majority Op. 361.) Although the group dispersed mere feet from where Black was walking, at no time did the officers speculate that Black was a member of that group. To the contrary, both sides agree that Black approached the police car from a completely different direction.[1] “When asked if he lived in the area, Black responded that he lived at an address across the street, a response consistent with the direction in which he was walking. It is undisputed that upon first seeing the officers, Black continued on his way and exhibited no suspect or evasive behavior. Neither the officers nor the Government point to any evidence in the record linking Black to seemingly criminal activity prior to his encounter with the police. Yet despite Black’s compliance, the police continued to question him, apparently unnerved that Black was “cupping” his hand in his pocket on that cold December evening.
The majority writes that Officer Adams asked Black to take his hand out of his pocket because Adams was “concerned *367 about the possibility of a weapon in Black’s pocket.” (Majority Op. 361.) However, “cupping” a hand does not indicate that one is carrying anything at all. Rather, cupping is the natural, relaxed position of a hand when placed in the warmth of a pocket. As such, to expect a man with his hand in his pocket to hold that hand stiffly open defies common sense. It would be far more unusual, and therefore suspicious, to observe someone holding his hand in his pocket in a completely straight and rigid position. Furthermore, as Black’s counsel noted during oral argument, Black’s having his hand cupped in his pocket is behavior completely consistent with the temperature on a winter evening in Richmond. In short, a “cupped” hand is nothing more than a relaxed hand and cannot create the sort of reasonable articulable suspicion required to justify a police search and seizure.
Without any suspicious behavior on the part of Black to justify his seizure, the majority is left with a de facto rule that allows police to search and seize anyone who finds himself in a “high-crime area.” The majority begins its analysis by stating that the Mosby Court area of Richmond[2] where these events occurred is “a ‘high-crime’ neighborhood that had been designated as a target of the police department’s violent crime reduction initiative, to increase police visibility in that area.” (Majority Op. 361.) The majority notes that “Detective Adams knew the neighborhood to be a high-crime area and he had made numerous arrests for drugs and trespassing in Mosby Court in his 12 years as a police officer.” (Majority Op. 361.) However, it is an unfortunate reality that, in America today, high-crime areas are frequently poor. Thus, by making much of the fact that the events of this case transpired in a “high-crime” area — notably near public housing projects — the majority embarks on the treacherous path of lowering the Fourth Amendment protection afforded to people in low-income areas.
Because the interaction between Black and the police was no longer voluntary when Adams demanded that Black remove his hand from his pocket after Black initially failed to comply, I would hold Black was seized at that time and that the police lacked a reasonable articulable suspicion for seizing and searching Black.
II.
In Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)), the Supreme Court explained that “a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free ‘to disregard the police and go about his business,’ the encounter is consensual and no reasonable suspicion is required.” Consequently, when examining whether a seizure has occurred, courts analyze whether “ ‘the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away.’ ” United States v. Gray, 883 F.2d 320, 322 (4th Cir.1989) (quoting United States v. Viegas, 639 F.2d 42, 45 (1st Cir.1981)); see also Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Undoubtedly, when Adams first asked Black where he lived and Black responded, their interaction required no objective verification. However, the inquiry does not end with the constitutionality of the initial encounter. Although police officers may approach individuals on public streets and ask them questions without invoking Fourth Amendment protections, “[s]ome contacts that start out as constitutional may, however, at some unspecified *368 point, cross the line and become an unconstitutional seizure.” United States v. Weaver, 282 F.3d 302, 309 (4th Cir.2002).
The touchstone of whether a seizure has taken place is the individual’s ability to terminate the encounter. See Hodari D., 499 U.S. at 637, 111 S.Ct. 1547 (citing Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868). When Adams asked Black to remove his hand from his pocket the first time and Black did not respond, Adams asked Black a second time, indicating that his instruction was in essence a mandate, not a mere request. At that point, Black had been seized. Furthermore, when Adams asked Black what was in his pocket, that question was tantamount to a search.
In affirming the district court, the majority upholds the conclusion that Black was seized when Adams told Black to remove his hand from his pocket because Adams did not want to shoot him.[3] I vigorously disagree. Adams’s interaction with Black went from a brief encounter between a police officer and a citizen to an investigatory stop, requiring the presence of an articulable suspicion, the moment that Black no longer felt able to end the encounter, something which occurred when he was first asked to remove his hand from his pocket, did not comply, and was asked again. Thus, the record is quite clear that it was not until after the seizure occurred and Black was forced to remove his hand from his pocket that he acted at all suspiciously.
III.
After articulating my position that the seizure occurred when Adams asked Black *369 a second time to remove Ms hand from his pocket, I now examine whether the police had a reasonable articulable suspicion for seizing Black.
This Court has reasoned that “the very point of Terry was to permit officers to take preventive action and conduct investigative stops before crimes are committed, based on what they view as suspicious— albeit even legal—activity.” United States v. Perkins, 363 F.3d 317, 326 (4th Cir.2004) (citing Illinois v. Wardlow, 528 U.S. 119, 125-26, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)) (emphasis in original). Thus, in assessing whether the officer had a reasonable suspicion, we look to “the totality of the circumstances.” United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
In analyzing the totality of the circumstances, the majority enumerates six factors it believes justify the search and seizure of Black. (See Majority Op. 365.) The fourth, fifth, and sixth of these factors occurred after the time at which I maintain Black was initially seized. I, therefore, examine the remaining three factors.
The majority cites both the placement of Black’s hand and his hesitanee to remove his hand from his pocket as circumstances justifying his search and seizure by the police. The relevant precedent of this Circuit, however, does not support this reasoning.
In United States v. Burton, 228 F.3d 524, 529 (4th Cir.2000) (quoting Bostick, 501 U.S. at 437, 111 S.Ct. 2382), we held that an individual’s refusal to cooperate does not on its own create sufficient justification for detention or seizure. We explained:
There is no evidence in the record that Burton made any moves as Officer Burke approached. He simply continued to stand by the telephone booth with his hand in his pocket. He did refuse to talk with the policemen and to remove his hand from his pocket, but something more is required to establish reasonable suspicion that criminal activity is afoot. And in the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety.
Id. In Burton, we rejected the officer’s explanation that he searched Burton because Burton failed to respond to questions and to remove his hand from inside his coat, which made the officer “uneasy.” Burton, 228 F.3d at 526. Thus, the fact that a man walking home with his hand in his pocket made Adams “uneasy” absent some other indicia of criminal activity could not possibly justify a search and seizure, yet the majority’s opinion buttresses its holding on this very faulty tenet. Under Burton, neither the placement of Black’s hand, nor his failure to comply with Adams’s initial request to remove his hand from his pocket justify the search and seizure.
We distinguished Burton in our opinion in United States v. Mayo, 361 F.3d 802, 806-08 (4th Cir.2004). In Mayo, we held that the officers had a reasonable suspicion to stop and frisk Mayo. Id. at 807-08. In determining the totality of the circumstances, the Mayo Court considered that (1) the encounter occurred in a high crime area, (2) Mayo put his hand in his pocket after seeing a marked police car, (3) Mayo attempted to evade the police, and (4) when confronted, Mayo acted in a nervous manner. Id.
Although the majority chooses to apply Mayo, the facts of the present case correspond more closely to Burton. Black did not react to the police: he did not alter his behavior, attempt to avoid the officers, or act nervously. Unlike Mayo, who put his *370 hand in his pocket after seeing the officers and who acted evasively, Black, like Burton, had his hand in his pocket before he saw the officers and continued doing exactly what he had been doing — walking home with his hand in his pocket — after seeing them. Because the only factor this case shares with Mayo is that both incidents occurred in a high-crime area, I would reverse the district court’s finding and apply Burton, holding that a “cupped” hand and a failure to comply with a police request do not justify a search and seizure.
Absent these other justifications, the majority is left only with the fact that “the encounter occurred in a high-crime area that Detective Adams knew to be a locus of drug — and firearm — related criminal activity.” (Majority Op. 365.) However, “[a] ‘high crime neighborhood’ is not by itself enough to raise a reasonable suspicion.” United States v. Moore, 817 F.2d 1105, 1107 (4th Cir.1987). Quite to the contrary of our precedent, the result of the majority’s opinion is that any person walking in a high-crime neighborhood becomes vulnerable to a police search. As mentioned, “high-crime” areas are often low-income areas. By creating zones of lower constitutional protection in poor neighborhoods, the majority, albeit unwittingly, engages in a blatant display of class discrimination of the basest variety. It has never been my understanding of the Fourth Amendment that those with less means likewise receive less constitutional protection as a result of their plight. It is written into the very fiber of our Constitution that the protections granted therein apply equally to all Americans, regardless of whether they are returning home to the grandest of mansions or the humblest of shanties. Such a broad reading of “reasonable articulable suspicion” significantly limits the freedom of people who happen to be in an area deemed “high crime.” Surely, the Constitution cannot support such an arbitrary and discriminatory result.

. In its brief, the Government explained that "[a] man later identified as the defendant, Sean Black, was standing approximately 30 feet off to the side of this group and began to walk in the direction of the officers as the group fled.” (Appellee's Br. 5 (emphasis added).)

. Mosby Court is a large public housing community found in Richmond’s East End.

. The entirety of the majority's position relies on the timing of the seizure. In its opinion, the majority writes:
Black argues ... that when he was seized during that encounter — when Adams ordered Black to take his hand out of his pocket because he did not want to have to shoot him — his Fourth Amendment rights were violated because the officers did not have a reasonable suspicion at that time that he had committed or was committing a crime.
(Majority Op. 363.) In a footnote, the majority states that I "ignore[ ] the conclusion made by the district court that Black was seized ‘when Officer Adams told Black to take his hand out of his pocket because he didn’t want to have to shoot him.' " (Majority Op. 363 n. 1 (emphasis added).) However, whether a seizure has occurred is a legal question, which we review de novo. In United States v. Sullivan, 138 F.3d 126, 132-33 (4th Cir.1998) (emphasis added) (internal quotations and citations omitted) (Niemeyer, J. writing for the Court), we explained that
[t]he test we apply in determining whether a person has been seized for the purposes of the Fourth Amendment is whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect’s position would have felt free to decline tire officers' requests or otherwise terminate the encounter. Because the test is an objective one, its proper application is a question of law.
Thus, what the majority cites as an inviolate district court ruling is actually only a comment made by the district court that "[i]t appears to me that Mr. Black was seized at the point when Officer Adams told Black to take his hand out of his pocket because he didn't want to have to shoot him” and is thereby subject to de novo review. (J.A. 148.) Moreover, this statement is not inconsistent with my conclusion that Black was seized before he was threatened with the gun. Despite what the majority implies in footnote 1, Black does challenge the order that he remove his hand from his pocket, which occurred prior to the officer’s threat to shoot him. In his brief to this Court, Black asserts that “[t]he fact that [he] had his hand closed in his pocket is not a justifiable reason to seize him and order that he remove it.” (Appellant’s Br. at 17.) Black explains that "Officer Minton admitted that tire second time the appellant was not 'asked' to remove his hand. Minton stated that he was 'ordered' to do so." {Id.) This statement refers to the second time Black was asked to remove his hand from his pocket and did so, not the instance in which Adams told Black for tire third time to remove his hand because Adams did not want to shoot Black.