PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　　　v.

FREDERICK A. JONES,

　　　　　　*Defendant-Appellant.*

No. 11-4268

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:09-cr-00047-REP-1)

Argued: March 22, 2012

Decided: May 10, 2012

Before MOTZ, KING, and GREGORY, Circuit Judges.

Reversed and remanded by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Gregory joined.

## COUNSEL

**ARGUED:** Nia Ayanna Vidal, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Erik Sean Siebert, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON**

**BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Stephen W. Miller, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Two police officers, in a marked patrol cruiser, closely followed a car from a public road onto private property, and then blocked the car's exit. The officers observed no traffic violation. The only assertedly suspicious activity they saw was the car's presence in a high-crime neighborhood with out-of-state tags. These facts alone led the officers to suspect that the car's occupants, four African American men, were involved in drug trafficking. Immediately after the driver, Frederick Jones, exited his car, the officers approached him and asked that he lift his shirt, which he did. The officers then asked him to consent to a pat down search, which he did.

After neither the shirt lift nor the search revealed anything, the officers discovered that Jones had committed a traffic violation, and so detained him. Subsequently, they found he possessed a firearm and a small quantity of marijuana. The district court denied Jones's motion to suppress this evidence, reasoning that the initial encounter—prior to the discovery of the traffic violation—was consensual and therefore did not infringe on Jones's Fourth Amendment rights. Because a reasonable person in Jones's position would not have felt free to terminate the initial encounter with the officers, we must reverse.

I.

The parties do not seriously dispute the facts of this case. During the early evening of August 13, 2008, Detective

Edward Aeschlimann and his partner, Officer Adrienne Rice, were patrolling the 2100 block of Afton Avenue in Richmond, Virginia. Det. Aeschlimann patrolled this area as part of the Focus Mission Team to interdict illegal drugs and firearms and deter robberies and burglaries. He had been on this assignment for six months and had been with the Richmond Police Department for five years.

At approximately 7:00 p.m., "in the daylight hours of the early evening," Det. Aeschlimann saw a dark blue Dodge Avenger, which he did not recognize, traveling on Afton Avenue. Det. Aeschlimann explained that the car "caught [his] attention" because it had New York tags, and "drugs are frequently trafficked between Richmond, Florida and New York on Interstate 95." He further explained that his interest "was piqued because [he] thought that that vehicle did not belong there and that the people in the vehicle didn't belong there." Four African American men occupied the vehicle.

Although initially driving in front of the car, Det. Aeschlimann turned around—possibly in a roundabout at the end of Afton Avenue—and "pulled behind" the car so as to follow it in his marked police patrol car.[1] Det. Aeschlimann, although looking for a traffic violation, was unable to "see any equipment violations that [he] could have stopped the [out-of-state] vehicle for."

Apartment complexes line Afton Avenue on both sides.

---

[1]The district court did not make any factual findings as to *how* Det. Aeschlimann maneuvered his vehicle behind the car, but Jones, who testified at the suppression hearing, stated he saw the police cruiser driving in front of him on Afton Avenue and then saw the cruiser turn around at the end of Afton Avenue and begin to follow his car. Jones further testified that he saw the police cruiser follow him into the driveway of the Graystone Apartments. Det. Aeschlimann did not offer any contrary testimony. We note that the district court did not find Jones's testimony lacking in credibility; rather, the court relied on that testimony in making findings of fact.

Shortly after Det. Aeschlimann began following the car, it turned into the driveway of one such complex—the Graystone Apartments. The detective followed the car into the driveway of the Graystone Apartments, which has a "no trespassing" sign posted on the property. Det. Aeschlimann testified that he suspected the men in the vehicle were trespassing and that "in that area" it was his common practice to follow "any car with an out-of-state tag" to determine whether the occupants of the vehicle were trespassing. The detective did not activate the lights or sirens of his marked police cruiser. He did, however, stay close to the out-of-state car—losing sight of it only for a second as it rounded a corner—because he "wanted to try to make contact with the folks inside the vehicle to see if they lived there because it's private property."

The driveway of the Graystone Apartments is a one-way roadway with a row of diagonal parking spaces on one side. The out-of-state car pulled into a diagonal parking space, and the four men emerged from it, including the driver, Jones. At this time, Det. Aeschlimann pulled to a stop and parked the police cruiser in the lane of traffic rather than pulling into one of the diagonal parking spaces. The detective believed that he "had no option [other] than to park where [he] did" to ensure that he would "have the opportunity to make contact with the occupants of the [out-of-state] vehicle."

Det. Aeschlimann conceded that he had no basis to stop Jones, or his car, but testified that "to make things what we term a consensual encounter[,] . . . [he] pulled past where Mr. Jones had parked" assertedly "leaving [Jones's] vehicle unobstructed to back out of the parking spot if that's something that he chose to do." However, the detective acknowledged that his police patrol car "obstructed them from leaving the driveway." As Det. Aeschlimann described the situation, "[g]iven that our vehicle was parked on a one-lane driveway that had parking stalls to the left-hand side and bushes and doors to the other row of apartments on the right-hand side, had they immediately backed their vehicle out or gotten back

into their car and backed the vehicle out, my vehicle down the driveway probably would have obstructed them from leaving the driveway." Thus, the detective acknowledged the placement of the police cruiser presented Jones with the options of "back[ing] [his] vehicle back up" the one-way driveway going in the "wrong direction" or requesting that the officers move their patrol car. Despite the "Do not enter" sign posted at the entrance to the driveway, Det. Aeschlimann testified that he would not have prevented Jones from backing his car up the one-way roadway in the wrong direction.

As Det. Aeschlimann and Officer Rice exited their patrol car, but before they reached the out-of-state vehicle, they saw two of the vehicle's passengers leave on foot. One of the passengers entered a nearby apartment. The officers did not see where the other man went. The officers did not pursue either man, nor did they attempt to speak to them. Instead, the officers proceeded immediately to speak to Jones, who had just emerged from and was still standing by the driver's door. At this time, the remaining passenger walked over to stand with Jones. Jones was returning from the store and held a slice of pizza in his hand.

The officers approached Jones and his companion; the officers stood at the rear of the car with their side arms holstered. Det. Aeschlimann asked Jones and his companion whether they "live out here." Jones answered that he did. Det. Aeschlimann testified that "[r]ight when I made contact with Mr. Jones and the other party," I said, "Hey, guys, can you do me a favor? Just lift your shirt for me so I can see you have no guns." The detective further testified that this was his "common practice, especially in high crime areas." Det. Aeschlimann acknowledged that Jones and his companion promptly complied by lifting their shirts, as requested. Then Det. Aeschlimann said, "Hey, guys, would you mind if I pat you down for weapons?" Jones and his companion turned around and raised their arms. The detective performed a quick pat down search and felt no weapons.

Jones testified that between the time the officers approached him and he was asked to lift his shirt, he asked why the officers were "stopping us," and Det. Aeschlimann responded "because it's a drug area." (Det. Aeschlimann did not contradict this account during his previous testimony and the Government did not recall him to refute Jones's statement.) Jones testified that at no point did he feel free to go. He explained that he did what the detective asked because he believed that the detectives were "looking for us to do something wrong at the time." He further explained that it was not just the presence of the police officers but their manner that led him to conclude that he was not free to go: "it wasn't" "just like how are you doing? Hey, how is your day going? It wasn't like that. It was all of a sudden, 'Lift your shirt. Can I pat you down?' From the beginning."

Not until after the shirt lift and pat down did Det. Aeschlimann ask Jones for identification. Jones replied that he left his license at home. Det. Aeschlimann testified that beginning at that point in the encounter, Jones would not have been free to leave, but rather "was being detained" for driving a motor vehicle without having his driver's license with him in violation of state law. *See* Va. Code § 46.2-104. Det. Aeschlimann then asked Jones for his personal information, and Jones gave him a false name, date of birth, and Social Security number. Unable to find this information in any of the state databases, Det. Aeschlimann confronted Jones. Jones then provided his true name and date of birth. Either just before or just after Jones gave his true information, one of the officers placed him in handcuffs. Det. Aeschlimann then returned to the police cruiser and ran Jones's information through the state databases; he learned that Jones's license had been revoked.

While Det. Aeschlimann was running Jones's information, Officer Rice conducted another pat down of Jones, and discovered a handgun in the crotch area of his pants. Det. Aeschlimann then placed Jones under arrest. During a search

of Jones's person incident to arrest, one of the officers discovered a small bag of marijuana in Jones's front pants pocket.

On July 13, 2010, a federal grand jury returned a superseding indictment charging Jones with one count of possession of a firearm by an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(g)(3). Jones moved to suppress the gun and marijuana and subsequent statements to the police, alleging that the officers had illegally seized him when Det. Aeschlimann asked him first to lift his shirt and then submit to a pat down search. The Government opposed the motion, contending that during the shirt lift and pat down the officers merely engaged in a consensual encounter with Jones. After the district court held a hearing on the matter, it denied Jones's motion in an oral ruling. The court concluded that the encounter was consensual up until the police learned that Jones was driving without a license, a traffic violation that provided the officer with reasonable suspicion to detain Jones.

A jury subsequently convicted Jones of the single charged crime, and the district court sentenced him to 41 months' imprisonment and a 3-year term of supervised release. Jones timely filed this appeal challenging the district court's denial of his suppression motion. When considering a district court's denial of a motion to suppress, we review the court's factual findings for clear error and all legal conclusions de novo. *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This guarantee does not extend to all police-citizen encounters. Rather, as the Supreme Court has instructed, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16

(1968). Police-citizen encounters that are consensual require no justification, but those that are not consensual impose a detention on a citizen and so must be supported by an officer's reasonable, articulable suspicion. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Terry*, 392 U.S. at 21.

As a general matter, law enforcement officers do not effectuate a detention or seizure "merely by approaching individuals on the street or in other public places and putting questions to them." *United States v. Drayton*, 536 U.S. 194, 200 (2002). But, an officer's authority to initiate an encounter with a citizen rather than detain him is "no greater than[ ] the authority of an ordinary citizen to approach another on the street and ask questions." *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000).

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. In resolving this question, we, like our sister circuits, have followed the standard set forth in *United States v. Mendenhall*, 446 U.S. 544 (1980) (plurality op.), asking "whether 'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *Mendenhall*, 446 U.S. at 554 (plurality op.)).

This "reasonable person" standard "is an objective one," thus "its proper application is a question of law." *Weaver*, 282 F.3d at 309 (quoting *United States v. Sullivan*, 138 F.3d 126, 133 (4th Cir. 1998)). We review such questions of law de novo. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding objective "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal");

*Mendenhall*, 446 U.S. at 554-55 (describing issue as "a matter of law").[2]

A court considers a number of factors in determining whether an officer's conduct would convey to a reasonable person that he is not free to leave. These include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature." *Gray*, 883 F.2d at 322-23.

## III.

With these governing principles in mind, we consider the "totality of the circumstances" in this case to determine whether the initial encounter between the police officers and Jones was consensual. *See Lattimore*, 87 F.3d at 653.

From the outset, the encounter in this case differs in a significant respect from the mine run of cases, on which the Government relies, which hold the challenged police-citizen

---

[2]In its brief to this court, the Government contended that we should review for clear error, relying on our discussion in *United States v. Lattimore* of the different question of "whether *consent to search* was freely and *voluntarily* given." 87 F.3d 647, 650 (4th Cir. 1996) (en banc) (emphases added) (relying on *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973) (describing subjective criteria of voluntariness analysis)). But later in *Lattimore*, we separately analyzed whether a consensual encounter had become a *seizure*; in this analysis we applied de novo review to determine whether an objectively "reasonable person" would have considered himself free to go. *Id.* at 653. Perhaps recognizing that these are distinct inquiries and that the latter standard of review applies to the question at issue here, at oral argument the Government acknowledged several times that our review as to whether the officers seized Jones is not for clear error but de novo.

encounter consensual. Unlike those cases, the encounter here began with a citizen *knowing* that the police officers were conspicuously following him, rather than a citizen, previously unaware of the police, being approached by officers seemingly at random. *Cf. United States v. Black*, 525 F.3d 359, 361, 363 (4th Cir. 2008) (officer spoke to defendant as he was walking along passenger side of police car, which had just arrived on the scene); *Weaver*, 282 F.3d at 307 (officer approached defendant on the street and asked if he could speak with him); *United States v. Analla*, 975 F.2d 119, 122, 124 (4th Cir. 1992) (two officers approached defendant while he was using a public pay phone and asked to speak with him when he was through); *Gray*, 883 F.2d at 321, 323 (plainclothes officer approached defendant in terminal area of airport, identified himself, and asked to speak with defendant).**³**

Indeed, in this case, the defendant, Jones, saw the officers turn their marked patrol cruiser around to follow his car, pulling in behind it on a public roadway, and following it onto private property. According to Det. Aeschlimann's own account, he followed Jones closely enough to look for (but not find) equipment failure on the car that would justify a traffic stop. Although the detective never initiated the marked police cruiser's lights or sirens, he and Officer Rice were in uniform and armed. Moreover, in Det. Aeschlimann's haste to speak with Jones he pulled the police cruiser to a stop in the lane of traffic and parked there, effectively blocking Jones from moving his vehicle. Accordingly, before the verbal encounter even

---

**³**In *United States v. Wilson*, 895 F.2d 168, 169-70 (4th Cir. 1990), on which the Government also relies, the officer did follow the defendant through an airport terminal; however, the officer was not in uniform but rather "was casually dressed" and did not identify himself as law enforcement until he "caught up" with the defendant and "displayed his credentials." Accordingly, while the officer testified that the defendant looked at him twice before quickly looking away, the facts do not suggest that the defendant knew the casually attired man was a policeman before the officer approached the defendant and asked "if he would talk with him." *Id.* at 170.

began, this case lacked a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer. *See Bostick*, 501 U.S. at 434 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." (internal quotation marks omitted)).

That this was not a routine encounter, but one targeted at Jones seems to us particularly significant given that the officers blocked in Jones's car to effectuate the encounter.[4] In *United States v. Green*, 111 F.3d 515 (7th Cir. 1997), the Seventh Circuit considered a very similar case. There, as here, the police followed a car into a driveway where the driver parked the car, and there, as here, the defendant then exited his car. *Id.* at 517. The Seventh Circuit concluded that, although the driver was no longer in his car, and indeed was walking away from his car toward a house, when "the officers pulled their car in behind the [defendant's car], blocking the car's exit . . . a reasonable person would not feel that he was free to leave." *Id.* at 520 n.1. Accordingly, the court found that the police

---

[4]Det. Aeschlimann claimed he would have permitted Jones to back his car out of the parking lot going the wrong way in a one-lane driveway, thus possibly backing up into oncoming traffic and through an entrance with a posted "Do not enter" sign. But no reasonable law-abiding person would take such evasive action in the presence of police officers, and certainly not when the officers have just finished closely following that person's vehicle from a public roadway onto private property. (Of course, if a person *did* take such evasive action in the presence of police officers, it might give the police reasonable suspicion for an investigatory stop. *See United States v. Smith*, 396 F.3d 579, 584 (4th Cir. 2005)). Moreover, Det. Aeschlimann's asserted intent to permit Jones, if he chose, to back the wrong way down a one-way driveway into oncoming traffic is irrelevant to our analysis of the legal question at issue because the detective never communicated this asserted intent to Jones. *See* 4 Wayne LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4 (4th ed. 2004) (explaining the lack of significance that an officer's "uncommunicated intention" has in the objective reasonable person inquiry).

had seized not only the passenger who remained in the car but also the driver who had left it. *Id.*

This holding comports with that of numerous other courts considering similar facts. *See, e.g.*, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("Given the fact that [the officer] blocked [the defendant's parked] car with his marked patrol car, a reasonable person in [his] position would not have felt free to leave."); *United States v. Kerr*, 817 F.2d 1384, 1386-87 (9th Cir. 1987) (reversing district court's holding that police blockage of defendant, who could have driven around the police car, was not detention because officer "[a]rriving in uniform and in a marked patrol car . . . unquestionably appeared to be acting in an official capacity" and, "[i]nstead of waiting . . . at the roadside," blocked defendant's car "thus precipitat[ing] the confrontation"); *Riley v. State*, 892 A.2d 370, 374 (Del. 2006) (concluding that "when police approached [defendant's car] with their badges and flashlights, after having parked their police vehicle . . . so as to prevent [defendant] from driving away, a seizure had taken place for purposes of Fourth Amendment analysis"); *Commonwealth v. Helme*, 503 N.E.2d 1287, 1288 (Mass. 1987) (finding investigatory stop occurred when officer "parked the police cruiser so as to block the defendant's [parked] automobile and prevent it from leaving the parking lot"); *State v. Roberts*, 977 P.2d 974, 977, 979 (Mont. 1999) (holding seizure occurred when officer, "armed and in uniform," followed defendant's car without activating lights or sirens, blocked the car from backing out of a driveway, and made an additional "show of authority in immediately exiting his patrol car and approaching" defendant who had exited his car simultaneously and was standing by the car door); *State v. Garcia-Cantu*, 253 S.W.3d 236, 246 & n.44 (Tex. Crim. App. 2008) (relying on fact that officer "parked his patrol car" such that it "'boxed in' [defendant's] parked truck, preventing him from voluntarily leaving" and noting that "[m]ost courts have held that when an officer 'boxes in' a car to prevent its voluntary departure, this conduct constitutes a Fourth Amendment sei-

zure"); *State v. Jestice*, 861 A.2d 1060, 1063 (Vt. 2004) ("[W]hen a police cruiser completely blocks a motorist's car from leaving, courts generally find a seizure. . . . [T]he fact that it was possible for the couple to back and maneuver their car past the patrol car and out of the trailhead parking lot does not convince us that this was a consensual encounter . . . ."); *McChesney v. State*, 988 P.2d 1071, 1075 (Wyo. 1999) (noting fact that officer "blocked in" defendant's car has "been found sufficient to constitute a seizure").

We agree that when an officer blocks a defendant's car from leaving the scene, particularly when, as here, the officer has followed the car, the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation. For this reason, the three cases on which the Government relies are inapposite. *See United States v. Thompson*, 546 F.3d 1223 (10th Cir. 2008); *United States v. Kim*, 25 F.3d 1426 (9th Cir. 1994); *United States v. Pajari*, 715 F.2d 1378 (8th Cir. 1983). In those cases, unlike the one at hand, the officers did not target and follow the defendant's car before blocking it in. The officers here did not merely "come upon an already parked car" as they did in *Kim*, 25 F.3d at 1430, or approach incognito from behind the defendant's parked car as they did in *Pajari*, 715 F.2d at 1380-81. Nor did the police merely ask to speak with a pedestrian who happened to be walking toward his car, as the officer did in *Thompson*, 546 F.3d at 1224-25. Rather, Jones saw the officers follow his car from a public street onto private property and then block the car from exiting in their haste to speak with him.

The Government contends that the placement of the police cruiser has minimal relevance because, as the police approached, two of Jones's companions walked away from the car—one into an apartment and one in the other direction —and the officers did not chase after them or call them back. But it is not altogether clear to us which way this fact cuts. On the one hand, that the officers allowed two passengers to

walk away from the vehicle could convey to a reasonable person that he, too, was free to walk away.

But, on the other hand, a reasonable person, whose car has been followed by police officers and who then saw the officers' apparent lack of interest in his passengers, might just as likely believe that the police wanted to question only him. Operating under this assumption, seeing two passengers walk away does nothing to quell, and may even enhance, a driver's reasonable suspicion that the police are targeting him.[5] *See United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010) (relying, in part, on fact that, although two officers "did not draw their weapons or touch" the defendant, "they were in uniform and arrived in a marked police car, and . . . immediately focused their attention on one person, [the defendant] in a group of four or five" which "contributed to their show of authority"). Indeed, the officers in this case proceeded immediately to the driver's side of the car where Jones was standing after just emerging from the driver's side door. *See United States v. Jones*, 269 F.3d 919, 926 (8th Cir. 2001) (weighing fact that police officer "exited his patrol car and engaged [defendant] outside the vehicle" in favor of finding encounter was non-consensual).

Furthermore, when the officers approached Jones, they did not ask if they could speak with him, which, based on a review of our cases, appears to be the routine practice of officers seeking to engage in a consensual encounter when they approach an individual on foot. *See, e.g.*, *Weaver*, 282 F.3d at 307; *Analla*, 975 F.2d at 124; *Gray*, 883 F.2d at 322. Nor did the officers explain their function of conducting a routine

---

[5]Irrelevant to our analysis is that Det. Aeschlimann assertedly had no intention to effectuate a traffic stop. For, "whether an encounter has become a seizure depends on the officer's objective behavior, not any subjective suspicion of criminal activity." LaFave, *supra*, § 9.4. Although Det. Aeschlimann did not activate the cruiser's lights or sirens, a reasonable person might very well have believed that police officers, who were following him closely and blocking his car, intended to stop him.

patrol in the area. *Cf. Drayton*, 536 U.S. at 198-99 (describing how officer walked from the rear of the bus toward the front explaining to each passenger he was conducting routine drug and weapons interdiction efforts); *Gray*, 883 F.2d at 323 (finding no detention when officers who approached defendant in an airport initially "informed [him] of the DEA's purpose and function, [and] treated the questioning as a matter of routine, rather than as a particularized investigation of [the defendant]").

Rather, in speaking to Jones, the officers clearly continued their show of authority. According to Det. Aeschlimann himself, "right when" he "made contact" with Jones, he asked Jones to "lift [his] shirt" to see whether Jones possessed a weapon. Not satisfied with the shirt lift, Det. Aeschlimann then asked Jones to consent to a pat down search, further implying that the officer suspected that Jones—a person the police had followed onto private property—might be armed. Thus, their immediate verbal exchange with Jones did nothing to lessen a reasonable person's suspicion that he was the target of a criminal investigation, and, in light of the totality of the circumstances, only enhanced it.

The Government makes much of the fact that Det. Aeschlimann requested, rather than ordered, Jones to lift his shirt and consent to a pat down search. A request certainly is not an order, but a request—two back-to-back requests in this case— that conveys the requisite show of authority "may be enough to make a reasonable person feel that he would not be free to leave." *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004).

For example, in *Richardson*, after completing a traffic stop, a police officer made a single request that the driver "just hang out right here for me, okay?" *Id.* at 630. Despite the fact that the officer "did not display an intimidating demeanor or use coercive language," the court held that the officer's "words alone were enough to make a reasonable person . . .

feel that he would not be free to walk away and ignore [the] request." *Id.*; *see also United States v. Smith*, 594 F.3d 530, 534, 539 (6th Cir. 2010) (holding police officer detained defendant, whose path was not blocked, when officer "asked him to stop"); *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (holding officer's second request to roll down car window constituted a seizure by "ma[king] it clear that [the defendant] was not free to ignore" the officer).

Here, too, under the circumstances of this case, we conclude that a reasonable person would not have felt free to walk away and ignore Det. Aeschlimann's nearly immediate "requests" that the person first lift his shirt and then submit to a pat down search. By making such intrusive "requests" almost immediately upon approaching Jones and his companion, Det. Aeschlimann communicated, through his conduct, that this was not just a routine encounter with the police. *See Terry*, 392 U.S. at 16-17 (explaining that "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons . . . performed in public by a policeman while the citizen stands helpless" inflicts "a serious intrusion upon the sanctity of the person").[6]

The two Supreme Court bus cases, on which the Government relies, *Drayton* and *Bostick*, are readily distinguishable.

---

[6]The Government emphasizes that Det. Aeschlimann's routine practice of asking individuals in high-crime neighborhoods to lift their shirts and consent to being patted down are "good policing" tactics designed to promote officer safety. Govt's Br. at 26. And the Government, at oral argument, argued that such fears justify this practice with regard to any individual who happens to live in or visit a high crime area. We do not discount the grave risks that police officers face on a daily basis whether confronting dangerous criminals or conducting routine traffic stops. Nor do we advance any bright-line rules regarding when and where an officer can ask to frisk a citizen for safety purposes during a consensual encounter. All that we hold here is that such fears for officer safety do not justify police conduct that would convey to a citizen, whose only suspicious behavior is driving a car with out-of-state tags in a high-crime neighborhood, that he *must* submit to a "shirt lift" and pat down search.

In both cases, the Court held there was no "per se rule" about when "encounters on a bus" constitute a seizure. *Drayton*, 536 U.S. at 203; *Bostick*, 501 U.S. at 440. But in both, the officers were, as they carefully told the passengers, conducting *routine* drug and weapons interdiction efforts during scheduled bus stops. Moreover, unlike the case at hand, in neither case did the officers exhibit any conduct "to suggest a particularized suspicion of wrongdoing among any of the passengers questioned." *See State v. Pitts*, 978 A.2d 14, 23 (Vt. 2009). Rather, in *Drayton*, an officer approached the defendant passenger in a non-threatening manner, working his way from the rear of the bus and explaining to each passenger that the officers were "conducting bus interdiction," 536 U.S. at 198-99; thus the defendant had no reason to believe he was suspected of any criminal activity or was the individual target of an investigation. And in *Bostick*, the police officers "specifically advised [the defendant] that he had the right to refuse consent" to any search. 501 U.S. at 432.

In contrast, here, the totality of the circumstances would suggest to a reasonable person in Jones's position that the officers suspected him of some sort of illegal activity in a "high crime area," which, in turn, would convey that he was a target of a criminal investigation and thus not free to leave or terminate the encounter. *See Williams*, 615 F.3d at 665 (explaining that "[n]o reasonable person would feel entitled to ignore an officer, turn, and walk away" even if questioned about something as benign as "trespassing"); *United States v. Tyler*, 512 F.3d 405, 410-11 (7th Cir. 2008) (explaining "[a] reasonable person would not feel free to walk away" after officers approached him and suggested he was violating open container laws); *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (en banc) (noting that "[s]tatements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention"); *Pitts*, 978 A.2d at 22 (finding a detention when "suspect was obviously followed" by police officers who

subsequently "questioned [him] about weapons and drugs" even though "the record reveals neither physical restraint nor blatantly aggressive or intimidating language"); *Parker v. Commonwealth*, 496 S.E.2d 47, 49, 51 (Va. 1998) (finding a detention when police officer "driving his police cruiser, followed the defendant" onto private property, "stopped the cruiser at a location where the defendant was standing," asked the defendant "if he had any guns or drugs in his possession" and asked to "pat him down").

Thus, the totality of the facts in this case requires us to conclude that the officers detained Jones before they had any justification for doing so. For two police officers in uniform in a marked police patrol car conspicuously followed Jones from a public street onto private property and blocked Jones's car from leaving the scene. The officers then quickly approached Jones by the driver's side of his car –- letting two other vehicle occupants walk away—and nearly immediately asked first that he lift his shirt and then that he consent to a pat down search for weapons. Although the uniformed officers did not draw their holstered weapons or use a threatening tone, these circumstances would suggest to a reasonable person that the officers were not "treating the encounter as 'routine' in nature," but rather that the officers were targeting him because he was engaged in "illegal activity." *See Gray*, 883 F.2d at 322-23. Any one of these facts on its own might very well be insufficient to transform a consensual encounter into a detention or seizure, but all of these facts viewed together crystallize into a Fourth Amendment violation.[7]

---

[7]We note that the Government has not suggested that, should we find a Fourth Amendment violation, the exclusionary rule would not apply. *See United States v. Edwards*, 666 F.3d 877, 887 (4th Cir. 2011) (declining to consider arguments not raised by the Government in exclusionary rule analysis). Moreover, as we have explained, "the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone," regardless of where that person resides or visits. *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011). Accordingly, we find the exclusion of evidence to be the proper remedy in this case because of the "the potential . . . to deter wrongful police conduct." *See Herring v. United States*, 555 U.S. 135, 137 (2009).

## IV.

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*