COURT OF APPEALS
DECISION
DATED AND FILED

January 25, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1253-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CT30

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JOSHUA L. THERING,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Sauk County: MICHAEL P. SCRENOCK, Judge. *Reversed and cause remanded with directions*.

¶1 BLANCHARD, J.[1] Joshua Thering pleaded no contest to operating a motor vehicle while intoxicated after the circuit court denied his motion to

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

suppress evidence and the court entered a judgment of conviction. Thering appeals, arguing that the court erroneously denied his suppression motion because Thering was unlawfully seized for Fourth Amendment purposes when the following occurred, at a time when police lacked reasonable suspicion to support a traffic stop or other detention of Thering. In the early morning hours, a fully marked police squad car performed a U-turn to follow Thering's car into an empty parking lot and came to a stop near Thering's car. An officer immediately got out of the squad car and approached Thering's car on foot. Given his immediate surroundings, Thering had one option for driving away, which would have been to back out and execute a Y-turn. The officer gestured for Thering to lower the driver-side window of his car. Thering lowered the window.

¶2    The circuit court concluded that these facts "very nearly mirror" the police-citizen encounter examined by our supreme court in *County of Grant v. Vogt*, 2014 WI 76, 356 Wis. 2d 343, 850 N.W.2d 253 (concluding that the encounter did not constitute a seizure under the Fourth Amendment). On that basis, the court determined that Thering was not seized. I agree that the encounter here is similar in significant respects to the encounter in *Vogt*. But I conclude that the totality of the circumstances here involved a meaningfully greater show of authority by police than in *Vogt*, which our supreme court characterized as a "close case." *Id.*, ¶54. The result was that Thering was unlawfully seized no later than the moment when the officer gestured for him to lower his window. Accordingly, the circuit court should now grant the suppression motion and reverse the judgment of conviction.

## BACKGROUND

¶3      The following is a summary of evidence presented at the suppression hearing and the circuit court's factual findings.

¶4      At approximately 4:15 a.m. on a Monday in November 2021, two police officers patrolled the streets of Reedsburg in a fully marked squad car. The squad car passed a car driven by Thering that travelled in the opposite direction. Thering stopped at a red light. Thering observed the squad car perform a U-turn and position itself directly behind Thering's car.[2]

¶5      When the light turned green, Thering proceeded through the intersection, drove approximately half a block, and turned into the northeast corner entrance of an empty parking lot. He drove west through the lot and came to a stop in a parking stall in the northwest corner of the lot. In front of the car was one curb; another curb ran along the passenger side. The parking lot had two exits: the northeast corner exit (where Thering's car entered) and another in the southwest corner.

¶6      The squad car followed directly behind Thering's car from the time Thering proceeded on the green light to the time his car came to a stop in the northwest corner stall of the lot. After Thering brought his car to a stop, the squad

_____

[2] In the circuit court, the prosecutor argued that the officers began to follow Thering because he was speeding, providing reasonable suspicion for a traffic stop. *See* **State v. Houghton**, 2015 WI 79, ¶30, 364 Wis. 2d 234, 868 N.W.2d 143 (reasonable suspicion is required to conduct a traffic stop). The court found, however, that it could not credit the officer's testimony that the officer was able, given the circumstances, to use radar to verify that Thering was speeding. More generally, the court determined that police lacked reasonable suspicion to stop Thering's car for any reason. The State on appeal does not challenge the court's credibility finding or make any argument that police had reasonable suspicion at any relevant time to stop Thering's car or to otherwise seize him.

car stopped in close proximity to his car. Specifically, the squad car stopped to the southeast of, and perpendicular to, Thering's car. The officers did not activate the squad car's emergency lights or sirens.[3]

¶7  One of the officers immediately got out of the squad car and approached the front driver side of Thering's car on foot.[4]  This officer, who was in uniform, made visual contact with Thering and gestured for him to lower the driver-side window. Thering lowered the window in response. Based on an ensuing police investigation, Thering was arrested on suspicion of operating a motor vehicle while intoxicated (OWI) and subsequently charged with two OWI offenses.

¶8  Thering moved to suppress evidence that resulted from what he argued was an unreasonable seizure under the Fourth Amendment that occurred upon the officer gesturing for him to lower his window. The prosecution argued that Thering was not seized at that time and that his lowering of the window was part of a consensual encounter to which Fourth Amendment protections do not apply. The circuit court denied Thering's motion based on a determination that he was not seized.

---

[3] There was no evidence presented that the officers trained a spotlight on Thering's car, and I assume for purposes of analysis that they did not.

[4] The record is not exactly clear on the timing, but at some point the second officer got out of the squad car and stood behind the first officer. For two reasons, I ignore the existence of the second officer. First, Thering testified that he was not aware of the second officer until after the first officer gestured for him to lower his window. Second, the circuit court made a finding, not challenged on appeal, that the second officer's presence "did not alter Mr. Thering's options for exiting the parking lot."

4

¶9    Thering pleaded no contest to second-offense OWI and the circuit court entered a judgment of conviction. Thering appeals.[5]

## DISCUSSION

¶10    I begin with a brief clarification about the timing of the alleged seizure. Thering's briefing does not make clear exactly when he contends the seizure occurred: when the officer gestured for Thering to lower his window, or instead when Thering complied with the gesture? For the following reasons, the issue is properly defined to be whether Thering was seized no later than the moment when the officer gestured for him to lower the window. When a defendant submits to a show of police authority, the seizure (if any) is defined to occur when a reasonable person in the position of the defendant would not, under the totality of the circumstances, have felt free to leave. *State v. Young*, 2006 WI 98, ¶¶32, 37, 294 Wis. 2d 1, 717 N.W.2d 729 (citing the test articulated in *United States v. Mendenhall*, 446 U.S. 544, 545 (1980)). However, when the defendant fails to submit to the show of authority, such as when the defendant flees in response, then by definition there was no seizure unless and until the defendant subsequently submits. *Young*, 294 Wis. 2d 1, ¶¶26, 40 (citing the test articulated in *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Here, Thering complied with the officer's gesture to lower the window and therefore seizure, if any, occurred no later than the moment of the officer's gesture.

---

[5] *See* WIS. STAT. § 971.31(10) ("An order denying a motion to suppress evidence … may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty or no contest to the information or criminal complaint.").

¶11 With that concept in mind, the State does not contest that, if Thering was seized when the officer made the gesture, the seizure violated the Fourth Amendment, with the results that Thering's suppression motion should have been granted and his conviction should be vacated. Thus, the sole issue on appeal is whether Thering was seized at that time. *See Vogt*, 356 Wis. 2d 343, ¶¶19, 24, 26 (constitutional protections "are not implicated until a government agent 'seizes' a person" (quoting *Young*, 294 Wis.2d 1, ¶23)).

¶12 Whether a seizure has occurred for Fourth Amendment purposes is reviewed under a two-part standard of review. *Vogt*, 356 Wis. 2d 343, ¶17. Appellate courts "will uphold the circuit court's findings of fact unless they are clearly erroneous, but the application of constitutional principles to those facts presents a question of law subject to de novo review." *Id.*

¶13 "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Mendenhall*, 446 U.S. at 545. A seizure occurs "'[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Vogt*, 356 Wis. 2d 343, ¶20 (quoting *Mendenhall*, 446 U.S. at 552). The test of whether a person is free to leave is objective, *Vogt*, 356 Wis. 2d 343, ¶25, and "considers whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances," *id.*, ¶30.

¶14 The parties' arguments, as well as the circuit court's conclusions, center on *Vogt*, which calls for a summary of *Vogt*.

¶15    An officer on patrol during the early morning hours observed Vogt's vehicle pull into a parking lot. *Id.*, ¶4. The officer drove his fully marked squad car into the lot and stopped behind Vogt's vehicle. *Id.*, ¶6. There were obstacles to either side of Vogt's vehicle, but Vogt had space to drive forward. *Id.*, ¶42. The officer knocked on Vogt's window and gestured for Vogt to lower it. *Id.*, ¶7. Vogt complied, and based on the officer's ensuing investigation, was charged with OWI. *Id.*, ¶¶8-9.

¶16    Our supreme court determined that, although it presented a "close case," police did not "show a level of intimidation or exercise of authority sufficient to implicate the Fourth Amendment" when the officer knocked and gestured for Vogt to lower his window. *Id.*, ¶54. Vogt argued that "the location of [his] vehicle in the parking lot was not conducive to simply driving away," but the supreme court determined that, although police had restricted Vogt's mobility, he was nevertheless able to drive away. *Id.*, ¶¶40-41. Specifically, Vogt could have "pulled forward and turned around" to exit the parking lot. *Id.*, ¶42. The court also noted that the officer's act of knocking on Vogt's window and gesturing for him to lower it was not, in context, "so intimidating as to constitute a seizure." *Id.*, ¶43. Although the court acknowledged that a person in Vogt's position might, under such circumstances, feel a "social instinct" to comply with an officer's request to lower the window, nevertheless "a reasonable person in Vogt's situation would have felt free to leave." *Id.*, ¶53.

¶17    Here, in a thoughtful order, the circuit court determined that the police-citizen encounter "very nearly mirror[s]" the encounter examined in *Vogt*, and under that authority, Thering was not seized, given the totality of the circumstances, at the moment when the officer gestured for him to lower the window. The court examined the layout of the parking lot and made a finding

7

that, like Vogt, Thering could have executed a maneuver to drive away rather than comply with the gesture for him to lower his window. Specifically, the court found that, although the presence of the officer and the squad car made it impossible for Thering to drive toward the southwest exit without risking injury to police, Thering could have found his way to the northeast exit by first driving in reverse, "with his front wheels turned to the right in order to direct the rear of his vehicle in a northeasterly direction," then executing "a Y-turn" that would have passed through "the parking stalls along the northern side."

¶18     Thering acknowledges, as he must, that some facts of *Vogt* are similar to the facts here. But he relies on differences that he contends show that the police interaction here involved a greater show of authority and that a reasonable person in his position would not have felt free to leave. The State does not argue that any facts here suggest a *lesser* show of authority than was present in *Vogt*. Instead, the State suggests that *Vogt* is on all fours and therefore controls. I conclude that there are differences between the facts here and those in *Vogt* such that a reasonable person in Thering's position would not have felt free to decline to comply with the gesture to lower the window and leave the scene. Before explaining that conclusion, I explain why I reject one of Thering's arguments.

¶19     Thering argues that *Vogt* is distinguishable because, as he testified at the hearing, he subjectively did not think at the time that it would have been possible for him to drive out of the parking lot safely. Further, Thering contends that, although the circuit court found that it would have been "possible" for him to move his car, the court did not find that it would have been safe to do so under the circumstances. This argument is not a reasonable interpretation of the court's findings. As noted above, the court essentially found that there was one way for Thering to maneuver his way out of the parking lot without placing police in

8

danger. Thering has not challenged this finding as clearly erroneous. Thering's testimony about his subjective beliefs on this topic do not control—the analysis is objective, "replac[ing] the individual with the paradigmatic reasonable person." *Id.*, ¶31.

¶20 Thering is on firmer ground, however, in making a separate but related argument. He contends that *Vogt* is distinguishable in part because driving out of the parking lot would have been more difficult for him than it would have been for Vogt. This argument finds support in the circuit court's findings of fact, which neither side challenges on appeal. Vogt would have been able to exit by pulling forward and performing a U-turn, for which there was "ample room." *Id.*, ¶42. By contrast, the court here found that Thering would have had to do more significant maneuvering to leave the parking lot. To repeat, the court found that, due to the position of the squad car and the officer, along with the curbs next to his car, Thering's path to the parking lot's southwest exit was effectively blocked. The result was that Thering would have had to proceed to the northeast exit by putting his car in reverse, turning the steering wheel to the right in order to follow the curb to the north, and ultimately performing a Y-turn. This would have been more complicated than the easy U-turn that would have been available to Vogt after he pulled slightly forward.[6]

---

[6] The State contends that the circuit court did not make a finding that the squad car "blocked Thering's exit in any meaningful way." But the State does not explain why the significant restriction of Thering's movement described above would not be "meaningful." The State appears not to accept the common sense proposition that the squad car and the police officer standing outside it—in the context of other physical features of the environment—could present meaningful impediments to exit, even if Thering was not completely blocked from any opportunity to make an exit.

¶21 From this it is apparent that, although both Thering and Vogt had just "one way out of the parking lot," *id.*, the officer here more significantly restricted Thering's movement than the officer in *Vogt* restricted Vogt's movement. Partial restriction of a person's movement can be considered a contributing factor to a seizure determination. Although not binding on Wisconsin courts, I find Seventh Circuit case law on this point to be persuasive. Under that authority, it is "clear that officers need not totally restrict a citizen's freedom of movement in order to convey the message that" leaving is not an option. *United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015); *see, e.g.*, *id.* (defendant seized when two officers on bicycles approached defendant, although the defendant could have walked around officers); *United States v. Burton*, 441 F.3d 509, 510 (7th Cir. 2006) (defendant seized when officers on bicycles blocked three sides of defendant's car, although defendant could have driven forward).

¶22 For these reasons, the fact that Thering's freedom of movement was more significantly restricted than Vogt's gives rise to a stronger show of police authority than was present in *Vogt*. I need not decide whether this stronger show of police authority is sufficient to show that a seizure occurred here when it is considered with all the other relevant facts discussed to this point in this opinion. As I now explain, I conclude that there is another meaningful difference in facts between this case and *Vogt* that tips the balance toward a seizure determination.

¶23 The circuit court noted that one fact here was not present in *Vogt*, namely, that Thering was aware that the squad car had executed a U-turn to position itself behind Thering's car, followed Thering into the parking lot, and come to a stop close to his car, albeit without at any point activating its emergency

10

lights or siren. I will refer to this as the "pre-contact following conduct."[7] The court found that the pre-contact following conduct "would have communicated in some manner that Mr. Thering's actions were of interest to the officer." At the same time, however, the court determined that this conduct did not "transform" the officer's "subsequent approach and invitation to engage in conversation into a sufficient display of authority to effect a seizure."

¶24 Thering argues that, when the pre-contact following conduct is taken into account, police made a show of authority sufficient to constitute a seizure. Thering cites for persuasive value two cases from other jurisdictions—*United States v. Jones*, 678 F.3d 293 (4th Cir. 2012), and *State v. Steele*, 2021-NCCOA-148, 277 N.C. App. 124, 858 S.E.2d 325—both of which consider similar police following conduct in the seizure context.

¶25 In *Jones*, two officers in a marked squad car "conspicuously" followed Jones's car down a public road and onto a one-way private driveway. *Jones*, 678 F.3d at 297, 300. After Jones stopped his car, the officers stopped their squad car in the driving lane, *id.* at 297, "effectively blocking Jones from moving his vehicle," *id.* at 300. The officers approached on foot and asked if Jones and his companion were carrying any weapons, and their investigation ultimately led to the discovery of contraband. *Id.* at 297-98. In evaluating the totality of the circumstances, the Fourth Circuit stated that the police-citizen encounter there differed "in a significant respect" from typical consensual encounters because, "[u]nlike those cases, the encounter here began with a citizen *knowing* that the

---

[7] The initial briefing of the parties on appeal did not develop arguments regarding the potential significance of the pre-contact following conduct and I requested letter briefs on that topic, which I have considered along with the parties' ordinary briefing.

police officers were conspicuously following him, rather than a citizen, previously unaware of the police, being approached by officers seemingly at random." *Id.* at 300 (emphasis in original). The fact that this was not a "routine" consensual encounter, but "one targeted at Jones," created a greater show of authority and supported the court's ultimate determination that Jones had been unlawfully seized. *Id.* at 301-02.

¶26 Similarly, in *Steele*, 277 N.C. App. 124, North Carolina's court of appeals considered whether a driver was seized when police "tailed" him in "a marked police cruiser down empty streets at 3 a.m., followed [him] into an empty parking lot, and then hailed [him] down [with] hand gestures." *Id.*, ¶1. In determining that the driver was seized, the court concluded that under these circumstances "any reasonable person would have realized that they are the target of police suspicion and are likely to be imminently pulled over." *Id.*, ¶39.

¶27 In sum, *Steele* and *Jones* both considered police conduct of conspicuously trailing a vehicle, immediately before directly encountering the followed person, to be a show of authority that could constitute a factor supporting a seizure determination. This accords with the principle, articulated by the Seventh Circuit, that the line between consensual contact and seizure "is crossed when police convey to an individual that he or she is suspected of a crime," and that such a message may be conveyed by "words or conduct." *Smith*, 794 F.3d at

686.[8] The applicable persuasive principle in these cases is that, depending on the totality of the circumstances, conspicuous following by police in advance of a direct encounter with a citizen can contribute to a reasonable belief that police intend to detain the person, or are about to detain the person, in a place that the person is not free to leave.

¶28    Here, the pre-contact following conduct, while it did not extend over a long period of time, was conspicuous and unambiguously focused on Thering's car alone in an apparently deliberate set of maneuvers.  And, when considered in combination with all other relevant facts, it would have contributed to a belief by a reasonable person in Thering's position that he was seized no later than the moment when the officer gestured to lower the window.  Significantly, all of this occurred at approximately 4:15 a.m., a time of day when the paradigmatic reasonable person would understand that a person's presence on the streets might contribute to an officer's reasonable suspicion of criminal activity.  *See State v. Morgan*, 197 Wis. 2d 200, 213-14, 539 N.W.2d 887 (1995) (concluding that "the time of night—four a.m.—may be considered" in determining whether there was reasonable suspicion to justify a seizure).  As in *Steele*, "any reasonable person" in Thering's position "would have realized that [the person was] the target of police suspicion and … likely to be imminently pulled over" and seized, whether only briefly or for a longer period of time.  *See Steele*, 277 N.C. App. 124, ¶39.

---

[8] While *United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015), employs the phrase "that he or she is suspected of a crime," the paradigmatic reasonable person would understand this dynamic to extend beyond police suspicion of a *crime* to include suspicion of a violation of a non-criminal statute or ordinance.  This is because, under certain circumstances, a person may be temporarily detained if suspected of such a violation.  *See Houghton*, 364 Wis. 2d 234, ¶30 & n.6,  ("reasonable suspicion that a traffic law has been or is being violated is sufficient to justify all traffic stops" and "in at least some circumstances, reasonable suspicion that a non-traffic-related law has been broken may also justify a traffic stop.").

¶29     The State argues that **Steele** and **Jones** are factually distinguishable. It contends that the defendant in **Jones**, unlike Thering, was essentially blocked from driving away, and that the defendant in **Steele**, unlike Thering, was hailed while he was in a moving vehicle. However, the State cites nothing in these two cases (or any other) to counter the persuasive principle, summarized above, that I take from the cases. Nor does the State argue that the pre-contact following conduct here would not convey to a reasonable person in Thering's position that he or she was the target of police suspicion. The State notes that, although Thering testified that he observed the squad car perform a U-turn, "Thering never testified to believing that the officers were following him." Again, however, the issue is not what Thering subjectively believed, it is what a reasonable person in his position would have believed. *See* **Vogt**, 356 Wis. 2d 343, ¶31. The State does not challenge as clearly erroneous the circuit court's express finding that the pre-contact following conduct "would have communicated in some manner that Mr. Thering's actions were of interest to the officer."

¶30     Summing up regarding the two significant factual deviations from **Vogt**, the encounter here involved conspicuous pre-contact following conduct, of which Thering was aware, and police restricted Thering's movement more meaningfully. At least by the time the uniformed officer gestured for Thering to lower his window, a reasonable person in Thering's position would have believed, based on the totality of the circumstances, that he or she had not only become the target of police suspicion but that he or she was now not free to leave. If the encounter in **Vogt** represented a "close case," as our supreme court observed, then the encounter here falls on the seizure side of the line.

¶31     The State accurately notes that the circuit court here placed weight on the absence of some facts that, as noted in **Vogt**, can support a determination of

seizure, namely, "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.*, ¶23 (quoting *Mendenhall*, 446 U.S. at 554). Nevertheless, these indicia were also absent in the "close case" of *Vogt*, and our supreme court there recognized that these indicia "need not be present for there to be a seizure." *Vogt*, 356 Wis. 2d 343, ¶¶53-54.

¶32     More broadly, the State takes the position that "[i]f something so small as a gesture [by an officer to lower a car window] constitutes a seizure," it would be impossible for police to carry out routine, necessary duties without violating the Fourth Amendment. One problem with this argument is that it fails to recognize the nature of the applicable test, which is "to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *see also Vogt*, 356 Wis. 2d 343, ¶38 (the seizure inquiry is not based on any bright-line rule but instead assesses "the totality of the circumstances."). As explained above, when considered in context of all relevant circumstances, the officer's gesture was the culmination of a series of acts representing a show of authority that would lead a reasonable person in Thering's position to believe, no later than the moment of the gesture, that he was not free to leave.[9] What might

---

[9] In the same vein, the State contends that *Vogt* creates a bright-line rule that police do not effect a seizure when a squad car stops behind a parked vehicle so long as the police do not activate their emergency lights. *See County of Grant v. Vogt*, 2014 WI 76, 356 Wis. 2d 343, 850 N.W.2d 253. But *Vogt* does not contain any such rule precluding a seizure determination; instead, it merely notes that our supreme court has "expressed reluctance to determine that pulling up behind a car and 'present[ing] indicia of police authority' automatically constitutes a seizure." *Id.*, ¶32 (quoting *State v. Young*, 2006 WI 98, ¶65, 294 Wis. 2d 1, 717 N.W.2d 729).

remain of the State's argument could represent a policy concern about the proper balance between Fourth Amendment protections and the ability of police to effectively exercise law enforcement powers. But courts must apply the constitutional law as it stands, without regard to potential policy preferences.

## CONCLUSION

¶33 For all of these reasons, I reverse the circuit court's judgment of conviction and remand with directions for the court to grant the suppression motion and vacate the judgment of conviction.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.